Homer J. HOLLAND and Howard R. Ross, Plaintiffs,

v.

UNITED STATES, Defendant.

No. 95–524C.

United States Court of Federal Claims.

July 30, 2003.

Melvin C. Garbow, Arnold & Porter, Washington, D.C., for plaintiffs. Howard N. Cayne, David B. Bergman, Walter F. Zenner, and Brian Duffy, Arnold & Porter, Washington, D.C., of counsel.

Patricia A. Smith and Patrick T. Murphy, Trial Attorneys, Jeanne E. Davidson, Deputy Director, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, Stuart E. Schiffer, Deputy Assistant Attorney General, United States Department of Justice, Washington, D.C., for defendant.

## OPINION

HORN, Judge.

The plaintiffs, Homer J. Holland (Holland) and Howard R. Ross (Ross), filed a complaint in this *Winstar*-related case for the recovery of damages arising out of the defendant's alleged breach of contracts, Fifth Amendment taking of plaintiffs' contract rights, and various other theories of recovery, as a result of the enactment of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA), Pub.L. No. 101–73, 103 Stat. 183 (1989). Specifically, the plaintiffs' complaint identifies ten causes of action against the defendant based on contractual and non-contractual theories of recovery.

Initially, the *Winstar*-related cases were consolidated before then-Chief Judge Smith for case management purposes. The plaintiffs in this case filed a cross-motion for partial summary judgment on liability with respect to their claims against the government for breach of express and implied-in-fact contracts with Judge Smith. The defendant filed a motion to dismiss and for partial summary judgment on liability, also before Judge Smith. The defendant's motion to dismiss and for partial summary judgment addressed the ten claims in the plaintiffs' complaint and the plaintiffs' request for interest on any damages awarded by the court. The plaintiffs' response to the defendant's motion to dismiss and cross-motion for partial summary judgment only addressed those arguments addressing the plaintiffs' breach of express and implied-in-fact contracts. The plaintiffs' response cited a case management order entered by Judge Smith on November 2, 2000, which allegedly stayed plaintiffs' obligation to respond to motions to dismiss and motions for partial summary judgment regarding non-contractual based claims made by the defendant in this *Winstar*-related case.

The November 2, 2000 order entered by Judge Smith provided that, after reviewing the issue, "the court will stay indefinitely the obligation to respond to motions for summary judgment and/or motions to dismiss regarding Constitutional claims. This category primarily includes, but is not limited to, Constitutional taking and due process claims." Judge Smith's November 2, 2000 order also stated that, weighing the potential benefits and the potential costs of ordering the stay, the *Winstar*-related cases could benefit from "guidance from the Federal Circuit [that] may turn out to be very helpful in streamlining much of the litigation." Judge Smith further stated that the determination

to stay the response to the motions to dismiss and motions for summary judgment regarding certain claims was supported by the fact that "dispositive motions as to contract liability will be briefed by the parties in the second-thirty cases [of which the instant case was a member] during the period of the stay."

When the above captioned case was reassigned to this Judge, the court ordered the parties to update and supplement their briefs originally filed with Judge Smith. The parties updated and supplemented their filings regarding plaintiffs' cross-motion for partial summary judgment and defendant's motion to dismiss and cross-motion for partial summary judgment arguments on contract liability alone, and did not address arguments previously made by the defendant regarding the plaintiffs' non-contractual based claims. The court's opinion issued at this time, therefore, only will address the contractual arguments made by the parties', as updated and supplemented, and will continue Judge Smith's stay of the responsive briefing on arguments made by the defendant on the non-contractual based claims in the plaintiffs' complaint.

The plaintiffs' cross-motion for partial summary judgment requests the court to find the defendant liable on their claims for breach of contracts arising out of the acquisition of five failed thrift institutions. The plaintiffs allege that the defendant is liable for breach of contracts under the United States Supreme Court's decision in *United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). The plaintiffs asserts that the documents involved in the acquisitions of the failed thrifts memorialize the defendant's promises regarding the treatment of the capital credit, subordinated debt, preferred stock, and the twenty-five year amortization of goodwill created through the push-down method of accounting.

The defendant's motion to dismiss alleges that the Assistance Agreements and related documents that the plaintiffs claim comprise the alleged contracts for the acquisition of two of the failed thrifts do not provide Holland and Ross contractual rights due to a lack of privity of contract because the plaintiffs were not signatories to the documents that constituted the alleged contracts. The defendant also has filed a cross-motion for partial summary judgment on certain aspects of the plaintiffs' claims arising out of the alleged contracts for the acquisition of four of the five failed thrifts.

## FINDINGS OF FACT

The events that precipitated this and the other *Winstar*-related cases were described in the plurality opinion of the United States Supreme Court in *United States v. Winstar Corp.*, 518 U.S. at 844–48, 116 S.Ct. 2432. While a full recitation of those events is unnecessary in this opinion, a brief outline of the facts and the regulatory system in effect during the critical period of time may be useful to place the instant case in context. The starting point is the passage of three statutes during the Great Depression, intended to stabilize the savings and loan industry:

> The Federal Home Loan Bank Act created the Federal Home Loan Bank Board (Bank Board), which was authorized to channel funds to thrifts for loans on houses and for preventing foreclosures on them. Ch. 522, 47 Stat. 725 (1932) (codified, as amended, at 12 U.S.C. §§ 1421–1449 (1988 ed.)); *see also* [H.R.Rep. No. 101–54, pt. 1, 292 (1989), U.S.Code Cong. & Admin.News 1989, pp. 86, 88]. Next, the Home Owners' Loan Act of 1933 authorized the Bank Board to charter and regulate federal savings and loan associations. Ch. 64, 48 Stat. 128 (1933) (codified, as amended, at 12 U.S.C. §§ 1461–1468 (1988 ed.)). Finally, the National Housing Act created the Federal Savings and Loan Insurance Corporation (FSLIC), under the Bank Board's authority, with responsibility to insure thrift deposits and regulate all federally insured thrifts. Ch. 847, 48 Stat. 1246 (1934) (codified, as amended, at 12 U.S.C. §§ 1701–1750g (1988 ed.)).

*United States v. Winstar Corp.*, 518 U.S. at 844, 116 S.Ct. 2432.

The regulatory system outlined by these three statutes worked well until the late 1970s and early 1980s. *Id.* at 845, 116 S.Ct. 2432. Between 1981 and 1983, however, 435

savings and loan operations failed. *Id.* Efforts by the government to deregulate the industry only exacerbated the problem, and by 1985 the estimated cost to the government to close insolvent thrifts rose to $15.8 billion, $11.25 billion more than the Federal Savings and Loan insurance Corporation's (FSLIC) total reserves. *Id.* at 847, 116 S.Ct. 2432.

Realizing that FSLIC lacked the funds to liquidate all of the failing thrifts, the Bank Board chose to avoid the insurance liability by encouraging healthy thrifts and outside investors to take over ailing institutions in a series of "supervisory mergers." *See* GAO, Solutions to the Thrift Industry Problem 52; L. White, The S & L Debacle: Public Policy Lessons for Bank and Thrift Regulation 157 (1991) (White). Such transactions, in which the acquiring parties assumed the obligations of thrifts with liabilities that far outstripped their assets, were not intrinsically attractive to healthy institutions; nor did FSLIC have sufficient cash to promote such acquisitions through direct subsidies alone, although cash contributions from FSLIC were often part of a transaction. *See* M. Lowy, High Rollers: Inside the Savings and Loan Debacle 37 (1991) (Lowy). Instead, the principal inducement for these supervisory mergers was an understanding that the acquisitions would be subject to a particular accounting treatment that would help the acquiring institutions meet their reserve capital requirements imposed by federal regulations.

*Id.* at 847–48, 116 S.Ct. 2432 (footnote omitted).

The Supreme Court in *Winstar* also recognized the impact of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), Pub.L. 101–73, 103 Stat. 183, had on the United States regulatory banking agencies and stated that:

FIRREA made enormous changes in the structure of federal thrift regulation by (1) abolishing FSLIC and transferring its functions to other agencies; (2) creating a new thrift deposit insurance fund under the Federal Deposit Insurance Corporation; (3) replacing the Bank Board with the Office of Thrift Supervision (OTS), a Treasury Department office with responsibility for the regulation of all federally insured savings associations; and (4) establishing the Resolution Trust Corporation to liquidate or otherwise dispose of certain closed thrifts and their assets. *See* note following 12 U.S.C. § 1437, §§ 1441a, 1821.

*United States v. Winstar*, 518 U.S. at 856, 116 S.Ct. 2432.

The plaintiffs' complaint identifies three transactions, involving the acquisition of five banking institutions, that generated the alleged expressed and implied-in-fact contracts between the plaintiffs and the defendant. The first of these transactions involved the plaintiffs' acquisition of three thrifts, Galva Federal Savings and Loan Association of Galva, Illinois (Galva), Home Federal Savings and Loan Association of Peoria, Illinois (Home), and Mutual Savings and Loan Association of Canton, Illinois (Mutual). The second transaction was the plaintiffs' acquisition of Republic Savings and Loan Association of South Beloit, Illinois (Republic). The third transaction concerned the plaintiffs' acquisition of the Peoria Savings and Loan Association of Peoria, Illinois (Peoria Savings).

### Galva, Home, and Mutual Transactions

According to the plaintiffs' complaint, by 1988, Galva, Home and Mutual were insolvent and suffering from "multimillion-dollar net-worth deficits for which the United States bore liability." The plaintiffs further allege that "[i]n an effort to resolve the Galva, Home, and Mutual problems at a minimum cost to the FSLIC insurance fund, FHLBB [Federal Home Loan Bank Board] and FSLIC solicited bids from potential acquirors of Galva, Mutual and Home." The plaintiffs' complaint states that the defendant accepted the plaintiffs' offer to acquire Galva, Home, and Mutual, and on July 29, 1988, the defendant and plaintiffs "executed and delivered a series of integrated documents which together comprised a unitary agreement" which provided for, among other things, "the merger of Galva with and into Home, the merger of Mutual with and into Home, the conversion of Home into River Valley [I] [River Valley Savings Bank, F.S.B.] and the acquisition of River Valley [I] by Holland and Ross."

On June 17, 1988, Stuart D. Root, Executive Director of the FSLIC issued a memorandum to the Federal Home Loan Bank Board (FHLBB) regarding the supervisory merger of Galva, Home, and Mutual, and the subsequent acquisition of the three thrifts by the plaintiffs. The June 17, 1988 FSLIC memorandum detailed the financial conditions of the thrifts, the marketing of the thrifts by the FSLIC, and the evaluation and recommendation of the proposed supervisory merger and acquisition of the institutions by the plaintiffs.

According to the June 17, 1988 FSLIC memorandum, Galva was a federally chartered, mutual association that received FSLIC account insurance beginning in 1946. Galva consisted of a single office located in the western part of illinois. During 1994 and 1985, the area in which Galva was located experienced a severe economic slump from which it had yet to recover as of the date of the June 17, 1988 FHLBB memorandum. Throughout 1984 and 1985, the FSLIC found that Galva operated in an "unsafe and unsound" manner. The June 17, 1988 FSLIC memorandum continued:

> Combined with the significant excess of interest-bearing liabilities over interest-earning assets, the association experienced a dramatic depletion of net worth and reported insolvency during September, 1985. Efforts by Galva management to locate a merger partner were unsuccessful. The case was transferred to the FSLIC on January 2, 1987. Galva continues to experience serious bookkeeping and documentation problems due to inexperienced management and a high turnover rate of key personnel. Operating performance continues to be hampered by the high level of problem assets, which are a result of the depressed regional economy and poor underwriting practices.

According to the June 17, 1988 FSLIC memorandum, Galva's liabilities exceed its assets by approximately $680,000.00 and Galva had a negative net operating income of $600,000.00 for the twelve months ending March 31, 1988.

Mutual was a state chartered, mutual association that received FSLIC account insurance beginning in 1963, and had one office in central Illinois. Although the June 17, 1988 FSLIC memorandum cited the thrift's financial problems, which stemmed largely from a bankruptcy filing by a business partner, the thrift also had a high level of non-performing assets "caused by a weak local economy." The June 17, 1988 FSLIC memorandum stated, "[a]s of the end of 1987, Mutual had a non-earning asset base which amounted to over 25% of total assets. Efforts by Mutual's management to arrange a viable merger were unsuccessful. Operating losses are expected to continue for the foreseeable future." The June 17, 1988 FSLIC memorandum found that Mutual's liabilities exceed its assets by approximately $5.43 million and Mutual had a negative net operating income of $740,000.00 for the twelve months ending March 31, 1988.

Home was a federally chartered, mutual association that received FSLIC account insurance beginning in 1948. Home's principle office and one branch office was located in Peoria, Illinois, with a second branch office located in Bartonville, a municipality of central Illinois. The June 17, 1988 FSLIC memorandum found that, "[a]s with both Galva and Mutual, Home has suffered significantly due to the general decline of the central Illinois economy." The June 17, 1988 FSLIC memorandum also cited regional industrial plant closings, the shutdown of local strip mining operations, non-performing assets, and other local economic difficulties as a cause of the thrift's financial trouble. The June 17, 1988 FSLIC memorandum found that Home's liabilities exceed its assets by approximately $3.44 million and had a negative net operating income of $2.13 million for the twelve months ending March 31, 1988. Home "reported insolvency as of April, 1987."

The June 17, 1988 FSLIC memorandum also described the FSLIC's decision to prepare a bid package consisting of a combination of the three thrifts, Galva, Home, and Mutual, for interested acquirers on an interstate, inter-industry basis. The FSLIC senior staff, in consultation with the FHLBB, prepared a bid package based on the thrifts' operation as of June 30, 1987, for a bid

conference held on September 10, 1987. The bid package for Galva, Home, and Mutual, dated August 12, 1987, stated that, "[d]ue to the financial condition of the financial institutions referenced above [Galva, Home, and Mutual], the Federal Savings and Loan Insurance Corporation ('FSLIC'), which insures the accounts of the Association(s), is seeking a merger or purchase of the assets and assumption of the liabilities of the above referenced Association(s)." The August 12, 1987 bid package provided that the FSLIC and the FHLBB would consider bid proposals that would involve regulatory forbearances.

Accompanying the August 12, 1987 bid package, the FSLIC and the FHLBB prepared and distributed a document titled "Information and Instructions for the Preparation and Submission of Proposals for the Acquisition of Galva, Home and Mutual," which provided that proposals would only be accepted for a combination of the three institutions. The material provided that FSLIC would consider any form of requested FSLIC assistance. The regulatory forbearances the FSLIC and the FHLBB would grant were described in Attachment 2 to the information and instructions of the August 12, 1987 bid package. Attachment 2 was Memorandum SP–37a, issued by the acting director of the FHLBB, Mr. Francis M. Passarelli, dated March 7, 1986. Memorandum SP–37 a provided that forbearances that may be granted on a case-by-case basis included the ability to credit FSLIC cash contributions to regulatory net worth and the ability to amortize intangible assets resulting from the use of purchase accounting by the straight line method over an unspecified number of years. The information and instructions of the August 12, 1987 bid package also provided that "[o]ther forbearances [not described in SP–37a] may be granted if an acquirer demonstrates that they are necessary."

Holland and Ross submitted a business plan, dated March 23, 1988, for the operation of Galva, Home, and Mutual. The purpose of the business plan was to "describe the strategic focus and direction intended for River Valley Savings Bank, F.S.B. (RVSB), [River Valley I] the resultant institution upon the merger of Home Federal Savings of Peoria, Mutual Savings of Canton, and Galva Federal Savings and Loan Association."

The June 17, 1988 FSLIC memorandum, following the background of the Galva, Home, and Mutual marketing efforts and analysis of the plaintiffs' acquisition proposal and business plan, concluded with its recommendation that:

[T]he Federal Home Loan Bank Board approve the acquisition of Galva, Mutual and Home by Homer J. Holland and Howard R. Ross. The transaction would bring $4.6 million of new capital into the industry and would place these problem associations under the control of individuals with a proven track record in the savings and loan industry. The transaction would also return an aggressive, full-service institution to the market area, thus enhancing the competitive environment and the financial alternatives offered to the communities involved.

On July 28, 1988, the FHLBB issued Resolution 88–638, authorizing the merger and acquisition of Galva, Home, and Mutual by Holland and Ross. Among other approvals, FHLBB Resolution 88–638 provided that the stock acquisition by Holland and Ross was "necessary to prevent the probable failure of Galva, Home and Mutual," and that the FHLBB did "not intend to disapprove the proposed acquisition of control of Galva, Home and Mutual by [Holland and Ross]." FHLBB Resolution 88–836 authorized River Valley I to issue preferred stock to FSLIC, and FSLIC to purchase the preferred stock, "in an amount not to exceed $5,000,000," subject to certain terms and conditions. FHLBB Resolution 88–638 further approved the issuance of a $4.6 million subordinate debenture by River Valley I "and the inclusion in its [River Valley I] regulatory capital of such subordinated debenture in accordance with § 561.13 of the Insurance Regulations," subject to certain conditions.

FHLBB Resolution 88–836 provided for the accounting principles applicable to the merger and acquisition of Galva, Home, and Mutual by Holland and Ross. River Valley I was to report to the FHLBB and FSLIC in accordance with generally accepted account-

ing principles, "as accepted, modified, clarified, or interpreted by applicable regulations of the Bank Board and the FSLIC," except to the extent of the following departures:

(a) Eight million dollars of the initial contribution by the FSLIC to River Valley [I], and four million six hundred thousand dollars of the principle amount of the Subordinated Debenture issued to American National Bank and Trust Company of Chicago, pursuant to § 6 of the Assistance Agreement, shall be credited to the regulatory capital account of River Valley [I] in accordance with the forbearance letter authorized pursuant to this Resolution; and

(b) The value of any unidentifiable intangible assets resulting from the application of push-down accounting in accounting for the Mergers and Stock Acquisition may be amortized by River Valley [I] over a period not in excess of twenty-five (25) years by the straight line method.

On July 28, 1988, Nadine Y. Washington, Assistant Secretary of the FHLBB, sent a letter to River Valley I granting certain regulatory forbearances. Among other forbearances allowed, the July 28, 1988 FHLBB letter authorized that a portion of the FSLIC cash contribution "not to exceed $8.0 million may be credited to River Valley [I]'s regulatory capital; therefore, for regulatory accounting purposes, River Valley [I] may book such contribution as a direct addition to its regulatory capital ...," subject to certain limitations. The July 28, 1988 FHLBB letter also authorized that for purposes of reporting to the FHLBB, "the value of any intangible asset resulting from the application of push-down accounting in accounting for the purchases, may be amortized by River Valley [I] over a period not to exceed 25 years by the straight line method."

On July 29, 1988, the FSLIC, Holland and Ross, and River Valley I, entered into an Assistance Agreement for the acquisition and merger of Galva, Home, and Mutual by Holland and Ross. The July 29, 1988 Assistance Agreement provided for the following: 1) the supervisory merger of Galva with and into Home; 2) the supervisory merger of Mutual with and into Home; 3) the simultaneous supervisory conversion of Home into a feder-

al stock savings bank, to be known as River Valley I, the resulting association; 4) the purchase of one hundred percent of the common stock of River Valley I by Holland and Ross; 5) the infusion of capital into River Valley I through the delivery of a subordinate debenture secured by Holland and Ross; 6) the purchase of River Valley I stock by the FSLIC for cash; and 7) the execution of the Assistance Agreement providing indemnification and financial assistance to River Valley I.

The July 29, 1988 Assistance Agreement also provided that generally accepted accounting principles would be used for calculations made under the Assistance Agreement, "except that where such principles conflict with the terms of the [Assistance] Agreement, applicable regulations of the Bank Board or the CORPORATION [FSLIC], or any resolution or action of the Bank Board approving or relating to the Transaction or to this Agreement; then this Agreement, such regulations, or such resolution or action shall govern."

Section six of the July 29, 1988 Assistance Agreement detailed the payments and contributions made by the FSLIC and Holland and Ross. Among other obligations, pursuant to section six of the Assistance Agreement, FSLIC contributed $34,215,888.00 to River Valley I, in addition to $13,000.00 per diem from April 1, 1998 to, and including, the effective date of the agreement. The FSLIC also "agreed to buy" 50,000 shares of preferred stock of River Valley I for $5 million under the Assistance Agreement. Section six of the Assistance Agreement also addressed the effect of the FSLIC cash contribution on regulatory capital requirements, limitations upon growth, and the payment of dividends:

For purposes of reports to the Bank Board (other than reports or financial statements that are required to be governed by generally accepted accounting principles) and all Bank Board regulations applicable to River Valley [I], Eight Million Dollars ($8,000,-000) of the cash contributions made under this § 6(a)(1) and (2) shall be credited to River Valley [I]'s net worth account and shall constitute regulatory capital as de-

fined in § 561.13 of the Insurance Regulations, 12 C.F.R. § 561.13 (1988), *provided* that for purposes of any of the provisions of the Insurance Regulations, RIVER VALLEY [I] shall be deemed to have regulatory capital not exceeding one dollar ($1.00) less than the fully phased-in regulatory capital requirement of § 563.13(b)(4)(A) of the Insurance Regulations by reason of the credit to regulatory capital provided by this § 6(a)(5), and *provided further* that RIVER VALLEY [I], when determining whether and when to declare a dividend payment to its stockholders, shall not include, in its calculation of available regulatory capital, the credit to regulatory capital provided by this paragraph. It is understood by the parties that the preceding sentence is not intended to address in any way the accounting treatment of contributions from the CORPORATION [FSLIC] that must be reflected in any filing that RIVER VALLEY [I] may make, whether to the Bank Board or otherwise, that requires the submission of financial statements prepared in accordance with generally accepted accounting principles.

In addition, section six of the Assistance Agreement required the plaintiffs to secure a subordinate debenture security delivered by River Valley I in the amount of $4.6 million. According to section six, the subordinate debenture was included in River Valley I's regulatory capital requirements "pursuant to § 561.13 of the Insurance Regulations."

**Republic Transaction**

On June 28, 1988, Leo B. Blaber, Jr., the Principle Supervisory Agent of the Seventh District Office of the FHLBB in Chicago, Illinois, issued a memorandum to John M. Buckley, Jr., Secretary of the FHLBB, recommending approval of the acquisition of Republic by River Valley Savings Bank of Rock Falls, Illinois (River Valley II), an Illinois state-chartered stock association, located in Rock Falls, Illinois, formally Rock Falls Savings and Loan Association. Holland and Ross owned one hundred percent of the outstanding stock of River Valley II. The June 28, 1988 FSLIC memorandum explained that Republic was a federally chartered mutual

savings and loan association with its principle place of business in South Beloit, Illinois, and operating a branch office in Roscoe, Illinois. According to the June 28, 1988 FSLIC memorandum, Republic had been reporting operating losses since March 1995, and first reported insolvency in June, 1986.

The government placed Republic into receivership in October 1986, and by March 31, 1988, the thrift was reporting a net worth deficit of almost $17 million. Due to the financial difficulties faced by the institution, the association was marketed on November 10, 1987, with assistance, to in-state associations and private and corporate investors. River Valley II was the only party to submit a proposal as a result of the solicitation. The terms set forth in River Valley II's December 24, 1987 proposal included that: 1) the FHLBB would approve River Valley II's application to include $2 million in subordinated debt securities as capital; 2) the cash contribution made to River Valley II by FSLIC, pursuant to an Assistance Agreement, would be a credit to River Valley II's regulatory capital; and 3) for purposes of reporting to the FHLBB, the value of any intangible assets resulting from the application of purchase method accounting in accounting for the purchase of Republic by River Valley II, may be amortized by River Valley II over a period not to exceed twenty-five years by the straight-line accounting method.

Pursuant to Resolution No. 88–612, dated July 27, 1988, the FHLBB authorized the supervisory conversion of Republic from mutual to stock form and the simultaneous merger of Republic with River Valley II. The FHLBB Resolution No. 88–612 provided that the $5 million of the initial cash contribution made by FSLIC to River Valley II under the July 29, 1988 Assistance Agreement would be credited to the regulatory capital account of River Valley II and "shall constitute regulatory capital as defined in § 561.13 of the Insurance Regulation, 12 C.F.R. § 561.13 (1988)." The FHLBB Resolution No. 88–612 also provided that River Valley II was obligated to deliver to the FSLIC "documentation satisfactory to the FSLIC showing that the issuance and sale of $2,000,000 in subordinated debt to American National Bank has

been successfully completed in accordance with 12 C.F.R. § 563.8–1."

On July 29, 1988, River Valley II and the FSLIC executed an Assistance Agreement for the supervisory conversion and merger of Republic with and into River Valley II. Among other provisions, the July 29, 1988 Assistance Agreement provided for a FSLIC cash contribution in the amount of $16.6 million to River Valley II, "plus $7,500 per diem for each day after March 31, 1988 until the Effective Date." The July 29, 1988 Assistance Agreement provided that $5 million of the FSLIC cash contribution would be credited to River Valley II's regulatory capital requirements.

The July 29, 1988 Assistance Agreement between River Valley II and FSLIC also provided that generally accepted accounting principles would be used for calculations made under the Assistance Agreement, "except that where such principles conflict with the terms of the [Assistance] Agreement, applicable regulations, or any resolution or action of the Bank Board approving or relating to the Transaction or to this Agreement, then this Agreement, such regulations, or such resolution or action shall govern."

On July 29, 1988, the Principal Supervisory Agent of the FHLBB in Chicago, Mr. Blaber, sent a letter to Mr. Holland, Vice Chairman of River Valley II, granting approval for the issuance and inclusion in its regulatory capital requirements "a subordinated debenture in the aggregate principle amount not to exceed $2,000,000 as calculated in accordance with 12 C.F.R. § 561.13," subject to certain conditions. The FHLBB also sent a May 18, 1989 letter signed by John F. Ghizzoni, Assistant Secretary, to Mr. Holland, Vice Chairman of River Valley II granting certain regulatory forbearances. The May 18, 1989 FHLBB forbearance letter authorized River Valley II to credit, as a direct addition to regulatory capital requirements, up to $5 million of the FSLIC cash contribution. The May 18, 1989 FHLBB forbearance letter also provided that, for purposes of reporting to the FHLBB, "the value of any intangible asset, resulting from the application of push-down accounting in accounting for the purchase [of Republic], may be amortized by

River Valley [II] over a period not to exceed 25 years by the straight line method."

**Peoria Savings Transaction**

On December 15, 1988, Stuart D. Root, Executive Director for FSLIC, issued a memorandum to the FHLBB providing his recommendation for the approval of the merger of Peoria Savings into River Valley I. According to the December 15, 1988 FSLIC memorandum, Peoria Savings was a state chartered mutual savings and loan association with its home office in Peoria, Illinois. Peoria Savings also operated two branch offices in Peoria and a wholly-owned subsidiary known as Peoria Savers Development, Inc., which provided real estate management and development services, and personnel insurance brokerage services. The December 15, 1988 FSLIC memorandum stated that for the fiscal year ending December 31, 1987, Peoria Savings incurred $2.57 million in losses, and was determined to be insolvent on or about July 31, 1988.

Following a review of River Valley I's proposal for the merger of Peoria Savings with River Valley I, the December 15, 1988 FSLIC memorandum concluded its recommendation as follows:

> The proposal submitted by Homer J. Holland on behalf of River Valley [I] incorporates all of the terms and conditions of the Expedited Case Processing Program and has been determined to be the least costly alternative to liquidation. In addition, we are confident that Homer Holland has the financial wherewithal and expertise to consummate this transaction in a manner consistent with the ECP II program.

On December 29, 1988, Nadine Y. Washington, Assistant Secretary of the FHLBB, issued Resolution No. 88–1490, approving the conversion of Peoria Savings from the mutual to the stock form of organization and the merger of the converted thrift into River Valley I. The December 29, 1988 FHLBB Resolution No. 88–1490 specified that within ninety days following the effective date of the merger, River Valley I was required to submit an analysis addressing the following: 1) "describe as of the Effective Date [of the merger] any intangible assets, including

goodwill, and the discount and premiums arising from the Merger to be recorded on the Resulting Association's books;" and 2) "substantiate the reasonableness and conformity with regulatory requirements of the amounts attributed to intangible assets, including goodwill, and the discount and premiums and related amortization periods and methods . . . ."

On December 31, 1988, an Assistance Agreement was entered into between FSLIC and River Valley I, relating to the merger of Peoria Savings into River Valley I. Pursuant to the December 31, 1988 Assistance Agreement, FSLIC was obligated to contribute $3.3 million in cash to River Valley I. The December 31, 1988 Assistance Agreement also provided that generally accepted accounting principles would be used for calculations made under the Assistance Agreement, "except that if such principles conflict with the terms of the [Assistance] Agreement, applicable regulations, or any resolution or action of the Bank Board approving or relating to the Transaction or to this Agreement, then this Agreement, such regulations, or such resolution or action shall govern."

On January 18, 1989,[1] John F. Ghizzoni sent a letter to Thomas W. Deford, President of River Valley I, describing certain regulatory forbearances the FHLBB granted River Valley I to facilitate the merger of Peoria Savings and River Valley I.

## DISCUSSION

### Regulatory Background

Prior to the enactment of FIRREA, the FHLBB was:

> [A]uthorized, under such rules and regulations as it may prescribe, to provide for the organization, incorporation, examination, operation, and regulation of associations to be known as Federal savings and loan associations, or Federal savings banks, and to issue charters therefor, giving primary consideration to the best practices of thrift

institutions in the United States. The lending and investment authorities are conferred by this section to provide such institutions the flexibility necessary to maintain their role of providing credit for housing.

12 U.S.C. § 1464(a) (1982).

For the purpose of this case, the FSLIC, under the direction of the FHLBB, insured the accounts of federal savings and loan associations, and federal savings banks. 12 U.S.C. § 1726(a)(1). The FSLIC operated an insurance fund for the protection of depositors in the federal savings and loan associations and federal savings banks. *See* 12 U.S.C. § 1727(a). The insurance fund was supported by insurance premiums assessed upon the thrift industry. 12 U.S.C. § 1727.

Pursuant to 12 U.S.C. § 1726(b), an insured thrift was required to maintain "adequate reserves" to be eligible for FSLIC insurance. 12 U.S.C. § 1726(b), *see* 12 C.F.R. § 563.13 (1988). A thrift could vary its regulatory capital requirements after obtaining approval by the FHLBB. *See* 12 C.F.R. § 563.14. Under FHLBB regulations, adequate reserves were determined by the thrifts "regulatory capital." The FHLBB defined regulatory capital as "the sum of all reserve accounts" including a thrift's reserve accounts, retained earnings, permanent common stock, and permanent preferred stock, among other reserves, 12 C.F.R. § 561.13.

The FHLBB was granted the authority to permit the conversion of a mutual institution into a stock institution, issue a charter for a federal savings and loan association, or federal stock savings bank, for the purposes of acquiring a mutual institution. *See* 12 U.S.C. § 1464(p)(1). Such authority was granted to the FHLBB:

> [O]nly to assist an institution in receivership, or if the Board has determined that severe financial conditions exist which threaten the stability of an institution and that such authorization is likely to improve

---

1. The parties' joint stipulations of fact refer to the FHLBB forbearance letter by John F. Ghizzoni as dated January 18, 1989. The FHLBB letter, however, is dated January 18, 1988. The parties have not addressed, and the court does not find it necessary to determine the correct

dated of the FHLBB forbearance letter for purposes of the parties' motions. Presumably, since the Assistance Agreement and the FHLBB Resolution No. 88–1490 were signed in December 1988, the correct date of the FHLBB forbearance letter was January 18, 1989.

the financial condition of the institution, or when the Federal Savings and Loan Insurance Corporation has contracted to provide assistance to such institution under section 406 of the National Housing Act [12 U.S.C. § 1729].

12 U.S.C. § 1464(p)(2) (brackets in original).

Section 1719 of Title 12, among other provisions, granted the FSLIC authority to carry-out certain steps with respect to a defaulting or ailing insured thrifts including the authority: "[T]o make contracts." 12 U.S.C. § 1725(c)(3).

## Defendant's Motion to Dismiss

The defendant has filed a motion to dismiss the plaintiffs' contractual claims arising out of the Republic and Peoria Savings transaction pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims (RCFC). The defendant does not make a similar argument with respect to the Galva, Home, and Mutual transaction, stating, "the Government does not dispute that plaintiffs are in privity of contract with respect to such agreement."

Subject matter jurisdiction may be challenged at any time by the parties, by the court sua sponte, even on appeal. *Fanning, Phillips, Molnar v. West*, 160 F.3d 717, 720 (Fed.Cir.1998) (quoting *Booth v. United States*, 990 F.2d 617, 620 (Fed.Cir.), *reh'g denied* (1993)); *United States v. Newport News Shipbuilding & Dry Dock Co.*, 933 F.2d 996, 998 n. 1 (Fed.Cir.1991). Once jurisdiction is challenged by the court or the opposing party, the plaintiff bears the burden of establishing jurisdiction. *See McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); *Alder Terrace, Inc. v. United States*, 161 F.3d 1372, 1377 (Fed.Cir.1998); *Trauma Serv. Group v. United States*, 104 F.3d 1321, 1324 (Fed.Cir.1997); *Rocovich v. United States*, 933 F.2d 991, 993 (Fed.Cir.1991); *Bowen v. United States*, 49 Fed.Cl. 673, 675 (2001) (noting that the plaintiff bears the burden of proof on a motion to dismiss for lack of jurisdiction), *aff'd*, 292 F.3d 1383 (Fed.Cir. 2002); *Schweiger Constr. Co. v. United States*, 49 Fed.Cl. 188, 205 (2001); *Catellus Dev. Corp. v. United States*, 31 Fed.Cl. 399, 404 (1994). A plaintiff must establish juris-

diction by a preponderance of the evidence. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed.Cir.1988); *Thomas v. United States*, 56 Fed.Cl. 112, 115 (2003); *Martinez v. United States*, 48 Fed.Cl. 851, 857 (2001), *aff'd in part*, 281 F.3d 1376 (Fed. Cir.), *reh'g denied* (2002); *Bowen v. United States*, 49 Fed.Cl. at 675; *Vanalco, Inc. v. United States*, 48 Fed.Cl. 68, 73 (2000); *Alaska v. United States*, 32 Fed.Cl. 689, 695 (1995), *appeal dismissed*, 86 F.3d 1178 (Fed. Cir.1996) (table). When construing the pleadings pursuant to a motion to dismiss, the court should grant the motion only if "it appears beyond doubt that [plaintiff] can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 654, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999) (quoting *Conley v. Gibson*, 355 U.S. 41, 46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)); *Brubaker Amusement Co., Inc. v. United States*, 304 F.3d 1349, 1355 (Fed.Cir.2002), *cert. denied, Penn Triple S v. United States*, —— U.S. ——, 123 S.Ct. 1570, 155 L.Ed.2d 311 (2003); *Leider v. United States*, 301 F.3d 1290, 1295 (Fed.Cir.2002), *reh'g and reh'g en banc denied* (2002), *cert. denied*, —— U.S. ——, 123 S.Ct. 1786, 155 L.Ed.2d 666 (2003); *Conti v. United States*, 291 F.3d 1334, 1338 (Fed.Cir. 2002), *cert. denied*, 537 U.S. 1112, 123 S.Ct. 904, 154 L.Ed.2d 785 (2003); *Consolidated Edison Co. v. O'Leary*, 117 F.3d 538, 542 (Fed.Cir.1997), *cert. denied sub nom. Consolidated Edison Co. v. Pena*, 522 U.S. 1108, 118 S.Ct. 1036, 140 L.Ed.2d 103 (1998); *see also New Valley Corp. v. United States*, 119 F.3d 1576, 1579 (Fed.Cir.), *reh'g denied, en banc suggestion declined* (1997); *Highland Falls–Fort Montgomery Cent. School Dist. v. United States*, 48 F.3d 1166, 1169 (Fed.Cir.), *cert. denied*, 516 U.S. 820, 116 S.Ct. 80, 133 L.Ed.2d 38 (1995); *Hamlet v. United States*, 873 F.2d 1414, 1416 (Fed.Cir.1989); *W.R. Cooper Gen. Contractor, Inc. v. United States*, 843 F.2d 1362, 1364 (Fed.Cir.1988) ("When the facts alleged in the complaint reveal 'any possible basis on which the non-movant might prevail, the motion must be denied.' "); *RCS Enters., Inc. v. United States*, 46 Fed.Cl. 509, 513 (2000).

Pursuant to Rule 8(a)(1) of the Rules of the Court of Federal Claims (RCFC) and Rule 8(a)(1) of the Federal Rules of Civil Procedure, a plaintiff need only state in the complaint "a short and plain statement of the grounds upon which the court's jurisdiction depends." RCFC 8(a)(1). However, "[d]etermination of jurisdiction starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed." *Holley v. United States*, 124 F.3d 1462, 1465 (Fed.Cir.), *reh'g denied* (1997) (citing *Franchise Tax Bd. v. Constr., Laborers Vacation Trust*, 463 U.S. 1, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983)). "[C]onclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss." *Briscoe v. LaHue*, 663 F.2d 713, 723 (7th Cir.1981), *aff'd*, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983); *see also Bradley v. Chiron Corp.*, 136 F.3d 1317, 1322 (Fed.Cir.1998) ("Conclusory allegations of law and unwarranted inferences of fact do not suffice to support a claim.").

When deciding a motion to dismiss based on lack of subject matter jurisdiction, this court must assume that all undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the non-movant's favor. *See Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Conley v. Gibson*, 355 U.S. at 45–46, 78 S.Ct. 99; *Boise Cascade Corp. v. United States*, 296 F.3d 1339, 1343 (Fed.Cir.2002), *cert. denied*, — U.S. ——, 123 S.Ct. 1484, 155 L.Ed.2d 226 (2003); *Pixton v. B & B Plastics, Inc.*, 291 F.3d 1324, 1326 (Fed.Cir. 2002); *Commonwealth Edison Co. v. United States*, 271 F.3d 1327, 1338 (Fed.Cir.2001) (quoting *New Valley Corp. v. United States*, 119 F.3d at 1580), *cert. denied*, 535 U.S. 1096, 122 S.Ct. 2293, 152 L.Ed.2d 1051 (2002); *Boyle v. United States*, 200 F.3d 1369, 1372 (Fed.Cir.2000); *Perez v. United States*, 156 F.3d 1366, 1370 (Fed.Cir.1998); *Highland Falls–Fort Montgomery Cent. School Dist. v. United States*, 48 F.3d at 1167 (citing *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed.Cir.1991)); *Henke v. United States*, 60 F.3d 795, 797 (Fed.Cir.1995); *Hamlet v. United States*, 873 F.2d at 1416; *Ho v. United States*, 49 Fed.Cl. 96, 100 (2001), *aff'd*, 30

Fed.Appx. 964 (Fed.Cir.2002); *Alaska v. United States*, 32 Fed.Cl. at 695. If a defendant or the court challenges jurisdiction or plaintiff's claim for relief, however, the plaintiff cannot rely merely on allegations in the complaint, but must instead bring forth relevant, competent proof to establish jurisdiction. *McNutt v. Gen. Motors Acceptance Corp. of Ind.*, 298 U.S. at 189, 56 S.Ct. 780; *see also Land v. Dollar*, 330 U.S. 731, 735 n. 4, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d at 747; *Catellus Dev. Corp. v. United States*, 31 Fed.Cl. at 404–05. When considering a motion to dismiss for lack of subject matter jurisdiction, the court may examine relevant evidence in order to resolve any factual disputes. *See Moyer v. United States*, 190 F.3d 1314, 1318 (Fed.Cir.1999); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d at 747; *see also Cedars–Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1584 (Fed.Cir. 1993) ("In establishing predicate jurisdictional facts, a court is not restricted to the face of the pleadings, but may review evidence extrinsic to the pleadings, including affidavits and deposition testimony."), *cert. denied*, 512 U.S. 1235, 114 S.Ct. 2738, 129 L.Ed.2d 859 (1994); *Vanalco v. United States*, 48 Fed.Cl. at 73 ("If the truth of the alleged jurisdictional facts is challenged in a motion to dismiss, the court may consider relevant evidence to resolve the factual dispute."). It is appropriate to grant a motion to dismiss under RCFC 12(b)(6) only if it appears "beyond doubt that [plaintiff] can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 654, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999); *Perez v. United States*, 156 F.3d 1366, 1370 (Fed.Cir.1998); *Commonwealth Edison Co. v. United States*, 56 Fed.Cl. 652, 656 (2003).

In order for this court to have jurisdiction over a plaintiff's complaint, the Tucker Act requires that the plaintiff identify an independent substantive right enforceable against the United States for money damages. 28 U.S.C. § 1491 (1994). The Tucker Act states:

The United States Court of Federal Claims shall have jurisdiction to render

judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1). As interpreted by the United States Supreme Court, this Act waives sovereign immunity to allow jurisdiction over claims (1) founded on an express or implied contract with the United States; (2) for a refund from a prior payment made to the government; or (3) based on federal constitutional, or statutory, or regulatory law mandating compensation by the federal government for damages sustained. *See United States v. Testan,* 424 U.S. 392, 400, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976), *reh'g denied,* 425 U.S. 957, 96 S.Ct. 1736, 48 L.Ed.2d 202 (1976) (citing *Eastport Steamship Corp. v. United States,* 178 Ct.Cl. 599, 605–06, 372 F.2d 1002, 1009 (1967)); *see also Palmer v. United States,* 168 F.3d 1310, 1314 (Fed.Cir. 1999); *Stinson, Lyons & Bustamante, P.A. v. United States,* 33 Fed.Cl. 474, 478 (1995), *aff'd,* 79 F.3d 136 (Fed.Cir.1996). A waiver of traditional sovereign immunity cannot be implied but must be "unequivocally expressed." *INS v. St. Cyr,* 533 U.S. 289, 299 n. 10, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001); *United States v. Nordic Village, Inc.,* 503 U.S. 30, 33, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992); *Ins. Co. of the West v. United States,* 243 F.3d 1367, 1372 (Fed.Cir.), *reh'g and reh'g en banc denied* (2001); *Saraco v. United States,* 61 F.3d 863, 864 (Fed.Cir.1995) (quoting *United States v. King,* 395 U.S. 1, 4, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969)), *cert. denied,* 517 U.S. 1166, 116 S.Ct. 1565, 134 L.Ed.2d 665 (1996).

The Tucker Act, however, merely confers jurisdiction on the United States Court of Federal Claims, " 'it does not create any substantive right enforceable against the United States for money damages.' " *United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (quoting *United States v. Testan,* 424 U.S. at 398–99, 96 S.Ct. 948), *reh'g denied,* 446 U.S. 992, 100 S.Ct. 2979, 64 L.Ed.2d 849 (1980); *White Mountain Apache Tribe v. United States,* 249 F.3d 1364, 1372 (Fed.Cir.), *reh'g and reh'g en banc denied* (2001), *aff'd,* 537 U.S. 465, 123 S.Ct. 1126, 155 L.Ed.2d 40 (2003); *Cyprus Amax Coal Co. v. United States,* 205 F.3d 1369, 1373 (Fed.Cir.2000); *cert. denied,* 532 U.S. 1065, 121 S.Ct. 2214, 150 L.Ed.2d 208 (2001); *New York Life Ins. Co. v. United States,* 118 F.3d 1553, 1555–56 (Fed.Cir.1997), *cert. denied,* 523 U.S. 1094, 118 S.Ct. 1559, 140 L.Ed.2d 792 (1998); *United States v. Connolly,* 716 F.2d 882, 885 (Fed.Cir.1983) (en banc), *cert. denied,* 465 U.S. 1065, 104 S.Ct. 1414, 79 L.Ed.2d 740 (1984). Individual claimants, therefore, must look beyond the jurisdictional statute for a waiver of sovereign immunity. *United States v. Mitchell,* 445 U.S. at 538, 100 S.Ct. 1349. In order for a claim to be successful, the plaintiff "must also demonstrate that the source of law relied upon 'can fairly be interpreted as mandating compensation by the federal government for the damages sustained.' " *White Mountain Apache Tribe v. United States,* 249 F.3d at 1372 (quoting *United States v. Mitchell,* 463 U.S. 206, 216–17, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983)); *United States v. Testan,* 424 U.S. at 400, 96 S.Ct. 948; *Tippett v. United States,* 185 F.3d 1250, 1254 (Fed.Cir.1999) ("[T]he plaintiff must assert a claim under a separate money-mandating constitutional provision, statute, or regulation, the violation of which supports a claim for damages against the United States.") (quoting *James v. Caldera,* 159 F.3d 573, 580 (Fed.Cir.1998), *reh'g denied* (1999)); *Doe v. United States,* 100 F.3d 1576, 1579 (Fed.Cir. 1996), *reh'g denied and en banc suggestion declined* (1997); *Eastport Steamship Corp. v. United States,* 178 Ct.Cl. at 607, 372 F.2d at 1009.

The plaintiffs' complaint alleges that the defendant entered into enforceable express, or, in the alternative, implied-in-fact, contracts for the acquisition of Republic and Peoria Savings with the defendant. The plaintiffs allege as a result of the enactment of FIRREA and the issuance of the subsequent regulations, the defendant breached its express contractual and/or implied-in-fact contractual agreements for the acquisition of Republic and Peoria Savings, which would have allowed River Valley I and River Valley

II: 1) to treat FSLIC cash contributions as credits to their regulatory capital; 2) to amortize regulatory capital over twenty-five years; and 3) to count subordinated debt and preferred stock as regulatory capital. The defendant's motion to dismiss alleges that the Assistance Agreements and related documents that the plaintiffs claim comprise the alleged contracts for the acquisition of Republic and Peoria Savings, do not provide Holland and Ross contractual rights due to a lack of privity of contract because the plaintiffs were not signatories to the documents that constituted the alleged contract. The defendant asserts that:

> [T]he Republic assistance agreement was between [River Valley II] and FSLIC, and the Peoria Savings transaction was between River Valley [I] and FSLIC.
>
> Plaintiffs were not signatories to these agreements and thus cannot be in privity of contract with the Government with respect to these agreements. Plaintiffs have not set forth any independent basis for a contract with the Government which would have permitted [River Valley II] and River Valley [I] to calculate regulatory capital in the manner alleged by plaintiffs. Plaintiffs thus lack privity of contract with the Government with respect to the breach of contract claims relating to the Republic and Peoria Savings transactions and these claims must, therefore, be dismissed.

■ "As a general proposition, the 'government consents to be sued only by those with whom it has privity of contract.'" *First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279, 1289 (Fed.Cir. 1999), *reh'g and reh'g en banc denied* (2000) (quoting *Erickson Air Crane Co. of Wash. v. United States*, 731 F.2d 810, 813 (Fed.Cir. 1984)). A signatory to the contractual documents may bring a direct suit for breach of contract. *See Castle v. United States*, 301 F.3d 1328, 1339 (Fed.Cir.2002). A plaintiff may also establish privity of contract through an implied-in-fact contract with the United States. *See Maher v. United States*, 314 F.3d 600, 603 n. 1 (Fed.Cir.2002). In addition, according to the United States Court of Appeals for the Federal Circuit, exceptions to the general rule requiring privity of contract include intended third-party beneficiaries, sub-contract pass-through suits, and Miller Act surety suits. *See id.; First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d at 1289.

■ The plaintiffs' response to the defendant's motion to dismiss asserts that the "law of contracts does not require that Holland and Ross be signatories to any particular constituent document in an agreement in order to have standing to sue for a government breach of the agreement." The plaintiffs argue that the court must not rely on a single document to determine the plaintiffs' contract rights, because "the contracts between the government and Holland and Ross are evident from all of the circumstances and documents involved, including the testimony of the parties, correspondence between them, FHLBB resolutions, internal government memoranda, and the business plans and accountants' analyses submitted to and approved by the government."

In *United States v. Winstar Corp.*, 518 U.S. at 839, 116 S.Ct. 2432, the United States Supreme Court acknowledged that although the issue of whether there was a contract between the thrifts and the government was not strictly before it, the Court nonetheless stated that the "resolution of the legal issues raised by the petition for certiorari, however, does require some consideration of the nature of the underlying transactions." *Id.* at 860–61, 116 S.Ct. 2432. The Supreme Court did not doubt the United States Court of Appeals for the Federal Circuit's finding that "'the government had an express contractual obligation to permit Glendale to count the supervisory goodwill generated as a result of its merger with Broward as a capital asset for regulatory capital purposes.'" *Id.* at 864, 116 S.Ct. 2432 (quoting *Winstar Corp. v. United States*, 64 F.3d 1531, 1540 (Fed.Cir. 1995) (*en banc*)). The Supreme Court in *Winstar* further addressed the defendant's contention that the understandings and agreements between the parties were simply "then-current federal regulatory policy" and stated:

> The Government does not seriously contest this evidence that the parties understood that goodwill arising from these

transactions would be treated as satisfying regulatory requirements; it insists, however, that these documents simply reflect statements of then-current federal regulatory policy rather than contractual undertakings. Neither the Court of Federal Claims nor the Federal Circuit so read the record, however, and we agree with those courts that the Government's interpretation of the relevant documents is fundamentally implausible. The integration clause in Glendale's SAA with FSLIC, which is similar in all relevant respects to the analogous provisions in the Winstar and Statesmen contracts, provides that the SAA supersedes "all prior agreements and understandings ... excepting only ... any resolutions or letters issued contemporaneously" by the Board, *id.,* at 598–599; in other words, the SAA characterizes the Board's resolutions and letters not as statements of background rules, but as part of the "agreements and understandings" between the parties.

*Id.* 862–63, 116 S.Ct. 2432.

The United States Court of Appeals for the Federal Circuit, in *California Federal Bank v. United States,* 245 F.3d 1342 (Fed. Cir.), *reh'g and reh'g en banc denied* (2001), addressed the government's argument that the absence of an Assistance Agreement incorporating the forbearance letters given to the plaintiff precluded the trial court from finding a contract in that *Winstar*-related case. *Id.* at 1346. The Federal Circuit disagreed and stated that the Federal Circuit's decision in *Winstar* "did not rely exclusively on the assistance agreements to find a contract; it considered contemporaneous documents and surrounding circumstances that included forbearances letters like those present here." *Id.* (citing *Winstar Corp. v. United States,* 64 F.3d at 1540). The Federal Circuit in *California Federal Bank* did not find the presence or absence of an Assistance Agreement dispositive to the question of contract formation between the government and the plaintiff. *Id.* The court also did not find a difference in the form of consideration to "negate the bargained-for exchange" in the transactions. *Id.* at 1347. The *California Federal Bank* court concluded:

Here, as in *Winstar III,* the government bargained with Cal Fed to assume the net liabilities of the acquired thrifts in exchange for favorable regulatory consideration allowing goodwill to be counted as an asset for regulatory capital purposes and to be amortized over 35 to 40 years. We agree with the Court of Federal Claims that "[i]f the factual records of individual cases show intent to contract with the government for specified treatment of goodwill, and documents such as correspondence, memoranda and [FHLBB] resolutions confirm that intent, the absence of an [assistance agreement] or [supervisory action agreement] should be irrelevant to the finding that a contract existed."

*Id.* (quoting *Cal. Fed. Bank v. United States,* 39 Fed.Cl. 753, 773 (1997)) (alterations in original).

In *LaSalle Talman Bank v. United States,* 317 F.3d 1363 (Fed.Cir.), *reh'g denied* (2003), the Federal Circuit again addressed the government's assertion that certain undertakings and promises made by the defendant were not part of the *Winstar*-related contract because they were recorded in agency documents and not in executed contracts. The *LaSalle Talman* Circuit Court panel rejected the government's argument and upheld the trial court's finding that in the totality of the record before the court, a contract existed based on the Supreme Court's decision in *United States v. Winstar Corp. See LaSalle Talman Bank v. United States,* 317 F.3d at 1370. The *LaSalle Talman* court held, "the Court in *Winstar* resolved the contractual nature of the totality of the agreements, promises, and undertakings relating to the assumption of liabilities, purchase accounting, and the treatment of supervisory goodwill and its amortization." *Id.* at 1369.

The decisions of the United States Supreme Court in *Winstar* and the United States Court of Appeals for the Federal Circuit in *California Federal Bank* and *LaSalle Talman,* as well as numerous other Circuit Court decisions, direct courts to review more than just one document when determining the terms of the contracts in these *Winstar*-related cases; courts must examine the sur-

rounding circumstances and the transaction as a whole, particularly the various documents that memorialized the parties agreements, understandings, and promises. *See also Sterling Savs. v. United States,* 53 Fed. Cl. 599, 613 (2002) ("[F]ollowing the reasoning of *Cal. Fed. II* [*Cal. Fed. Bank v. United States,* 245 F.3d at 1347], the reciprocal resolutions of the Bank Board and Plaintiff's board of directors, along with the business plan contained within the agreement between FSLIC and Plaintiff, are sufficient evidence of intent to enter into a bargained-for exchange between the parties."); *Franklin Fed. Savs. Bank v. United States,* 53 Fed.Cl. 690, 711 (2002) (finding an express contract between the plaintiff and defendant based on the "transaction documents in this case, especially when viewed in the context of the many other supervisory transactions which dominated the relationship between the U.S. Government and the thrift industry during the 1980s ...."); *La Van v. United States,* 53 Fed.Cl. 290, 297–99 (2002) (relying on the conversion application, accountants' documents, FHLBB documents, FHLBB memoranda, and letters on record, to find the existence of an implied-in-fact contract between the plaintiffs and defendant); *Centex Corp. v. United States,* 52 Fed.Cl. 599, 603–07 (2002) (relying on various documents and the "provisions of the contract which indirectly, but clearly, reference" the plaintiff to find that the plaintiff "was plainly part of that larger transaction," and, therefore, had privity of contract to sue the defendant); *S. Cal. Fed. Sav. & Loan Ass'n v. United States,* 52 Fed.Cl. 531, 541–42 (2002) (relying on multiple documents to determine non-signatories to Assistance Agreement were nonetheless parties to the contract); *Home Sav. of Am. v. United States,* 51 Fed.Cl. 487, 498–99 (2002) (holding that although plaintiff was not a signatory to the Assistance Agreement, the FHLBB resolutions in the case explicitly recognize plaintiff as a party to the contract); *Bluebonnet Sav. Bank v. United States,* 43 Fed.Cl. 69, 74 (1999) ("That is, the Assistance Agreement, forbearance letter, etc., are not discrete contracts but parts of the overall transaction agreement as discussed above. Moreover, there is no requirement that one be a signatory to the contract. Instead, one must be a party, and both Mr. Fail and CFSB meet that requirement.").

The court in *Bank of America v. United States,* 55 Fed.Cl. 670 (2003), however, addressed the question of whether investors who claimed "to be the moving force behind HonFed's [Honolulu Federal Savings and Loan Association] re-emergence as a viable banking institution and therefore must be counted among the Bank Board's contracting partners." *Id.* at 677. Holding that the investor plaintiffs were not parties to the *Winstar*-related transaction in the case, the *Bank of America* court discussed recent decisions of the Court of Federal Claims cited by the investor plaintiffs for the proposition that investors in banking holding companies, who provided financial guarantees in support of *Winstar*-related transactions, were deemed to be contracting parties who may sue for breach of contract. *Id.* at 677 (citing *Franklin Fed. Savs. Bank v. United States,* 53 Fed.Cl. 690; *S. Cal. Fed. Sav. & Loan Ass'n v. United States,* 52 Fed.Cl. 531; *Bluebonnet Sav. Bank v. United States,* 43 Fed.Cl. 69). The *Bank of America* opinion provides:

> We have considered these cases but do not find them supportive of investors' position. What these cases demonstrate is that in order for a shareholder to be considered a party to the underlying transaction, the shareholder's participation not only must be essential to the transaction, but also must be acknowledged in the form of a written promise, sought by and made directly to the government, that is formally recognized to constitute a part of the parties' overall undertaking.

*Id.* (footnote omitted).

As discussed above, the United States Court of Appeals for the Federal Circuit has instructed that courts should not rely merely on one document, such as the Assistance Agreement, but should focus on "contemporaneous documents and surrounding circumstances" to find whether a contract exists in these *Winstar*-related cases. *Cal. Fed. Bank v. United States,* 245 F.3d at 1346. Therefore, plaintiffs do not, necessarily, have to be signatories to a contract to be a party to it. *See Centex Corp. v. United States,* 52 Fed.Cl. at 603 ("Nevertheless, plaintiffs are correct

that Centex does not have to be a signatory to the Agreement to be a party to it.") (citing *Tri–Cities Newspapers Inc. v. Tri–Cities Printing Pressmen and Assistants' Local 349*, 427 F.2d 325, 327 (5th Cir.1970)); *see also Sacramento Nav. Co. v. Salz*, 273 U.S. 326, 329, 47 S.Ct. 368, 71 L.Ed. 663 (1927) ("But a contract includes, not only the promises set forth in express words, but, in addition, all such implied provisions as are indispensable to effectuate the intention of the parties and as arise from the language of the contract and the circumstances under which it was made."); *Chicago, R.I. & P. RY. Co. v. Denver & R.G.R. Co.*, 143 U.S. 596, 609, 12 S.Ct. 479, 36 L.Ed. 277 (1892) ("There can be no doubt whatever of the general proposition that in the interpretation of any particular clause of a contract, the court is not only at liberty, but required, to examine the entire contract, and may also consider the relations of the parties, their connection with the subject-matter of the contract, and the circumstances under which it was signed."); *Woodbury v. United States*, 176 Ct.Cl. 838, 850, 364 F.2d 993, 1000 (1966) (recognizing "the twin legal premises, unassailable when properly invoked, that (a) liability may be assumed under a written contract even though it is not signed by the party obligated, and that (b) terms which are plainly implied (from the circumstances) in an agreement should be given life when they are indispensable to effect the parties' intention.") (internal citations omitted).

A review of the contemporaneous documents in the Republic and Peoria Savings transactions and of the contemporaneous documents and the surrounding circumstances of the Home, Galva, and Mutual transaction, executed within days of the execution of the Republic transaction, provide the evidence necessary for the court to find privity of contract between the plaintiffs and the defendant. Moreover, the surrounding circumstances and ownership positions relevant to Peoria Savings, Republic, and the Galva, Home, and Mutual transactions, exhibit the understandings of the parties to the undertakings. As noted above, the defendant does not disagree that the plaintiffs were parties to the documents that comprise the contract between the plaintiffs and the

defendant in the Galva, Home, and Mutual transaction. The FHLBB July 28, 1988 Resolution No. 88–638 stated that, "[t]o accomplish the acquisition of Galva, Home and Mutual by the Investors [Holland and Ross], the Investors have proposed ... Home [Galva and Mutual] be converted into a federally-chartered stock savings bank to be named River Valley Savings Bank, F.S.B. [River Valley I]" The plaintiffs were not signatories to the transaction documents in the Republic and Peoria Savings transactions because Republic and Peoria Savings were acquired by thrifts already established, and entirely owned by Holland and Ross. The June 28, 1988 FSLIC memorandum, issued by Leo B. Blaber, Jr., the Principle Supervisory Agent of the Seventh District Office of the FHLBB in Chicago, Illinois, recommended approval of the acquisition of Republic by River Valley II and stated that Holland and Ross owned one hundred percent of the outstanding stock of River Valley II into which Republic was merged. The December 15, 1988 FSLIC memorandum issued by Mr. Blaber also stated that the plaintiffs owned one hundred percent of River Valley I, into which Peoria Savings was merged.

Also on June 28, 1988, the FHLBB issued an addendum to the June 28, 1988 FSLIC memorandum regarding the proposed acquisition of Republic by River Valley II. The June 28, 1988 addendum describes the obligations of the plaintiffs under the proposed Republic transaction and refers to Holland and Ross as the actual acquirers of Republic as follows:

The acquirers have requested FHLBB approval for the issuance of a subordinated debenture. The Subordinated Debt Security will be issued to American National Bank and Trust Company of Chicago. The face amount of this security will be $2.0 million and will be purchased at par (no discount or premium). The term of the debenture will be ten years, and it will bear a floating rate of interest at one half or one percent above prime as established by American National.... We note that the acquirers have entered into a put agreement with American National Bank. This agreement has the same effect as a

personal guarantee on the note. The agreement allows American National to exercise an option requiring Messrs. Ross and Holland to repurchase the debt upon default or failure by the principals to perform their obligations under the Put Option and Purchase Agreement.

Additionally, Messrs. Ross and Holland have each agreed to personally repurchase 50% of the security, beginning on the fourth anniversary date of the issuance. The schedule contained in the agreement calls for repurchase by the principals at the aggregate rate of $286,000 for years four through nine and $284,000 upon maturity.

On July 6, 1988, the FHLBB issued a supplement to the June 28, 1988 FSLIC memorandum. The July 6, 1988 supplement issued by the FHLBB demonstrates the defendant's understanding as to the parties to the Republic transaction, and evidences the extensive negotiations between the FHLBB and Mr. Holland. The July 6, 1988 supplement also consistently refers to the obligations of Holland and Ross as the actual applicants seeking to acquire Republic. For example, the July 6, 1988 supplement provides:

> The acquirer is understandably reluctant to amend the financial statements submitted in support of the offering. *He* feels that not only may it cast an unfavorable light on him as a businessman, but also perhaps upon the Bank Board, since it may appear that the Bank Board is vacillating in its posture regarding this matter.

(Emphasis added).

The FHLBB Resolution No. 88–612, issued on July 27, 1988, also is one of the documents that evidences the overall agreement and approves the conversion and merger of Republic and River Valley II. The FHLBB Resolution No. 88–612 describes the transaction as necessary for the prevention of the failure of Republic, and indicates that based on the administrative file before the FHLBB, the merger will result in a "viable entity." The FHLBB Resolution No. 88–612 specifically refers to the undertakings of the plaintiffs detailed in the internal FHLBB

memoranda outlined above, and provides the following:

> Within four (4) business days after the Effective Date, River Valley [II] shall deliver to the FSLIC documentation satisfactory to the FSLIC showing that the issuance and sale of $2,000,000 in subordinated debt to American National Bank has been successfully completed in accordance with 12 C.F.R. § 563.8–1 . . . .

The referenced $2 million in subordinated debt addressed immediately above in the FHLBB July 27, 1988 Resolution No. 88–612 was, as indicated in the FHLBB June 28, 1988 addendum, the personal undertaking of the plaintiffs.

In addition, on July 29, 2003, the FHLBB issued a forbearance letter, addressed to Mr. Holland, which granted approval to include the $2 million subordinated debt issued by River Valley II and guaranteed by Holland and Ross in the thrift's regulatory capital.

Similar to the situation in Republic, the documents in the record before the court regarding the acquisition of Peoria Savings by River Valley I also evidence the formation of a contract between the plaintiffs and defendant and the defendant's treatment of Holland and Ross as parties to the transaction. On November 14, 1988, River Valley I submitted its acquisition proposal for Peoria Savings. As evidence of the plaintiffs' understanding of the terms of the contract between Holland and Ross and the defendant, the November 14, 1998 acquisition proposal provided that the plaintiffs would personally invest $5 million in cash in River Valley I to increase its regulatory capital upon the acquisition of Peoria Savings. As support for the proposed acquisition, the November 14, 1998 proposal noted that Holland and Ross were previously successful in their personal consummation and acquisition of Republic, Home, Galva, and Mutual. The November 14, 1998 acquisition proposal provided the strategy for the successful operation of Peoria Savings subsequent to the acquisition and detailed "[t]he Holland and Ross strategy" for the acquisition of Peoria Savings.

The defendant's understanding of the obligations of Holland and Ross as parties to the transaction are reflected, among other docu-

ments, in two interoffice memoranda of the FHLBB, both dated November 22, 1988, which detail the agency's review of the plaintiffs' November 14, 1998 acquisition proposal. The first internal memorandum provides the following comments:

As an initial matter, it should be noted that in July of this year, Messrs. Holland and Ross acquired Home Fed, Galva, and Mutual by a merger, with River Valley Savings Bank, FSB [River Valley I], being the resulting institution. These individuals currently have a bid pending for Chillicothe FS & LA, such institution to be acquired either by River Valley Savings Bank, FSB (Peoria) [River Valley I] or River Valley Savings Bank (Rock Falls) [River Valley II]. Thus, it will be necessary to consider the financial capacity of Messrs. Holland and Ross, as well as River Valley [I] FSB, to acquire Peoria Savings and Chillicothe. . . . The letter from American National Bank submitted by Messrs. Holland and Ross concerning financing does not constitute a firm commitment. The District Bank may have some thoughts on the ability of Messrs. Holland and Ross to secure the necessary financing on a timely basis. . . .

The second memorandum states:

Phil Mento told me that MAD/FSLIC was inclined to agree with our recommendation to proceed with Homer Holland's proposal; however, Vicki Hawkins (memo attached) and Richard Wissinger were concerned that certain provisions of Holland's proposal caused the proposal to be non-conforming. Specifically, the amortization of goodwill for 25 years and the granting of regulatory forbearances on scheduled items. These may be oversights on the part of the bidder so Phil Mento suggested that we contact Homer Holland and notify him that these issues *may* cause the proposal to be considered non-conforming. Then we should determine if Homer Holland would be willing to remove them from his proposal. Phil Mento proposes to contact us Monday, 11/28/88 to discuss Holland's response and hopefully to give us the "go-ahead" to begin negotiating with Homer Holland, if necessary. . . . At this point, the Escrow Agreement will only be given to Homer Holland.

(Emphasis in original).

The December 15, 1988 FSLIC memorandum issued by Stuart D. Root, Executive Director for FSLIC, which recommended the approval of the acquisition of Peoria Savings by River Valley I also detailed negotiations and discussions held between the defendant and Mr. Holland, the FSLIC's understanding that the plaintiffs were the acquirers of Peoria Savings, and the plaintiffs $5 million personal contribution to regulatory capital to complete the acquisition of Peoria Savings. The December 15, 1988 FSLIC memorandum provides the obligations of the plaintiffs to invest $5 million and examples of the negotiations conducted between the parties, such as Mr. Holland being notified of a deficiency regarding the acquisition proposal and that "he [Mr. Holland] submitted a clarification to his proposal [ ]." The December 15, 1988 FSLIC memorandum also provided further examples of the negotiations between the defendant and the plaintiffs:

By letter dated December 2, 1988, (Exhibit 14), Mr. Holland was notified that River Valley [I]'s proposal was the least costly, and that under the terms of the ECP II a business plan and merger application are required to be filed within seven days. By separate letter, dated December 2, 1988 (Exhibit 15), Mr. Holland was also informed that an earnest money deposit in the amount of $295,880 was required to be deposited to the FSLIC's treasury account within 48 business hours of receipt of the letter.

The December 15, 1988 FSLIC memorandum included a section titled "Capital Infusion by the Acquirer," which detailed the plaintiffs' $5 million contribution and refers to Holland and Ross as the actual acquirers of Peoria Savings. The December 15, 1988 FSLIC memorandum provides the "Background and Financial Capacity of the Recommended Acquirer" and lists the plaintiffs and their one hundred percent ownership interest in River Valley I. The December 15, 1988 FSLIC memorandum concludes by relying on the personal experience of the plaintiffs as a basis for approving the transaction and

states that, "we are confident that Homer Holland has the financial wherewithal and expertise to consummate this transaction in a manner consistent with the ECP II program."

The record before the court also includes a December 16, 1988 memorandum from Mr. Blaber, the Principle Supervisory Agent in Chicago of the FHLBB, to Mr. Buckley, Secretary to the FHLBB, recommending the acquisition of Peoria Savings and describing, as a basis for the recommendation, the plaintiffs' investment of $5 million. The December 16, 1988 memorandum noted that the infusion of the plaintiffs' $5 million "will increase the regulatory capital of the merged institution to $22.89 million or 6.59% of total liabilities if merged as of September 30, 1988." In recommending the approval of the Peoria Savings transaction, the December 16, 1988 memorandum stated that "River Valley [I] possesses, both the financial and managerial expertise which allows it to provide the products and services at a cost which the PSLA [Peoria Savings] as an independent insured institution could not provide." The December 16, 1988 memorandum also based the FHLBB recommendation, in part, on the qualification of the plaintiffs as reflecting the "utmost integrity" and respectability.

Based on the acquisition proposals submitted by the plaintiffs for the Republic and Peoria Savings transactions, the internal FHLBB and FSLIC documents, and the FHLBB resolutions approving the transactions, the court finds that the plaintiffs were parties to the Republic and Peoria Savings transactions. The record reflects the parties' understanding that Holland and Ross negotiated the transactions, not on behalf of River Valley I and River Valley II, but as the actual acquirers of the failed thrifts. Holland and Ross were not merely investors, but the driving force behind the transactions, a role clearly reflected in the record before the court. Moreover, the circumstances surrounding the acquisitions of Republic and Peoria Savings provide evidence that the plaintiffs were supplying monetary contributions, management resources, and their ownership of River Valley I and River Valley II as consideration for the alleged favorable

regulatory treatment that would provide the necessary conditions for the successful operation of the acquired failed thrifts. The court, therefore, finds that the plaintiffs have privity of contract to assert this court's jurisdiction over their contract claims.

## Cross–Motions for Summary Judgment

As found above, the plaintiffs were parties to the agreements for the acquisition of Republic and Peoria Savings. The plaintiffs have filed a cross-motion for partial summary judgment on liability with respect to their claims against the defendant for breach of the Galva, Home, and Mutual, Republic, and Peoria Savings contracts. The plaintiffs allege that the defendant is liable for breach of contract under the United States Supreme Court's decision in *Winstar*. The plaintiffs assert that the documents involved in the acquisitions of Republic, Peoria Savings, Galva, Home, and Mutual memorialize the defendant's promises regarding the treatment of the capital credit, subordinated debt, preferred stock, and the twenty-five year amortization of goodwill created through the push-down method of accounting. The plaintiffs' cross-motion for partial summary judgment alleges that:

> The government's promises to Holland and Ross in the Republic acquisition were, in legal effect, identical to the promises the government made to Holland and Ross in the Home [Galva, and Mutual] transaction. As in Home, the government promised forbearances regarding capital credits, subordinated debt and goodwill, all as set forth in the Assistance Agreement, Forbearance Letter and Bank Board Resolution. The government gave Holland and Ross these promises as consideration to induce them to guarantee personally $2 million in borrowings by River Valley [II] Rock Falls, which improved the capital structure of the thrift and protected the government's deposit insurance fund.

The plaintiffs also state in their cross-motion for partial summary judgment that in the Peoria Savings transaction, the defendant contracted with the plaintiffs to allow River Valley I to apply push-down accounting, and for the amortization of goodwill over twenty-five years.

The defendant has filed a cross-motion for partial summary judgment on the plaintiffs' claim that the $5 million of preferred stock purchased by the FSLIC would be included as regulatory capital in the Galva, Home, and Mutual transaction. The defendant asserts that pursuant to the July 29, 1988 Galva, Home, and Mutual Assistance Agreement, the FSLIC agreed to purchase from River Valley I 50,000 shares of preferred stock for $5 million. Whether, according to the defendant, the preferred stock purchased by FSLIC could be included in regulatory capital was determined by the regulations that existed at that time, and not by any alleged contract with the government. Therefore, according to the defendant, "any subsequent change to these regulations by FIRREA does not provide a basis for a contract claim by plaintiffs." The defendant further argues that it is entitled to partial summary judgment on plaintiffs' contract claim based on the goodwill created pursuant to the Peoria Savings transaction. The defendant asserts that the "December 31, 1988 assistance agreement relating to the Peoria Savings transaction does not provide that goodwill could be amortized over twenty-five years, nor do any of the documents incorporated pursuant to the integration clause contained therein." The defendant has not addressed the plaintiffs' claims regarding the Republic transaction.

The parties have filed cross-motions for partial summary judgment on the plaintiffs' complaint pursuant to RCFC 56. RCFC 56 is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed.R.Civ.P.) and is similar both in language and effect. Both rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c); Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1323 (Fed.Cir.),

*reh'g denied and reh'g en banc denied* (2001); *Monon Corp. v. Stoughton Trailers, Inc.*, 239 F.3d 1253, 1257 (Fed.Cir.2001); *Avenal v. United States*, 100 F.3d 933, 936 (Fed.Cir. 1996), *reh'g denied* (1997); *Creppel v. United States*, 41 F.3d 627, 630–31 (Fed.Cir.1994). A fact is material if it will make a difference in the result of a case under the governing law. Irrelevant or unnecessary factual disputes do not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 247–48, 106 S.Ct. 2505; *see also Monon Corp. v. Stoughton Trailers, Inc.*, 239 F.3d at 1257; *Curtis v. United States*, 144 Ct.Cl. 194, 199, 168 F.Supp. 213, 216 (1958), *cert. denied*, 361 U.S. 843, 80 S.Ct. 94, 4 L.Ed.2d 81 (1959), *reh'g denied*, 361 U.S. 941, 80 S.Ct. 375, 4 L.Ed.2d 361 (1960).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence and determine the truth of the case presented, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249, 106 S.Ct. 2505; *see, e.g., Ford Motor Co. v. United States*, 157 F.3d 849, 854 (Fed.Cir. 1998) (the nature of a summary judgment proceeding is such that the trial judge does not make findings of fact); *Johnson v. United States*, 49 Fed.Cl. 648, 651 (2001), *aff'd*, 52 Fed.Appx. 507 (Fed.Cir. Dec.3, 2002); *Becho, Inc. v. United States*, 47 Fed.Cl. 595, 599 (2000). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 250–52, 106 S.Ct. 2505; *Jay v. Sec'y of Dep't of Health and Human Servs.*, 998 F.2d 979, 982 (Fed.Cir.), *reh'g denied and en banc suggestion declined* (1993). When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Hall v. Aqua Queen Mfg., Inc.*, 93 F.3d 1548, 1553 n. 3 (Fed.Cir.1996). In such a case, there is no need for the parties to undertake the time and expense of a trial, and the

moving party should prevail without further proceedings. Summary judgment::

> [S]aves the expense and time of a full trial when it is unnecessary. When the material facts are adequately developed in the motion papers, a full trial is useless. "Useless" in this context means that more evidence than is already available in connection with the motion for summary judgment could not reasonably be expected to change the result.

*Dehne v. United States,* 23 Cl.Ct. 606, 614–15 (1991) (citing *Pure Gold, Inc. v. Syntex, Inc.,* 739 F.2d 624, 626 (Fed.Cir.1984)), *vacated on other grounds,* 970 F.2d 890 (Fed.Cir.1992); *United States Steel Corp. v. Vasco Metals Corp.,* 55 C.C.P.A. 1141, 394 F.2d 1009, 1011 (1968).

Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. 2505; *Eli Lilly & Co. v. Barr Labs., Inc.,* 251 F.3d 955, 971 (Fed.Cir.2001), *cert. denied,* 534 U.S. 1109, 122 S.Ct. 913, 151 L.Ed.2d 879 (2002); *Gen. Elec. Co. v. Nintendo Co.,* 179 F.3d 1350, 1353 (Fed.Cir. 1999). In other words, if the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. at 587–88, 106 S.Ct. 1348; *Monon Corp. v. Stoughton Trailers, Inc.,* 239 F.3d at 1257; *Wanlass v. Fedders Corp.,* 145 F.3d 1461, 1463 (Fed.Cir.), *reh'g denied and en banc suggestion declined* (1998).

The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Trilogy Communica-*

*tions, Inc. v. Times Fiber Communications, Inc.,* 109 F.3d 739, 741 (Fed.Cir.) (quoting *Conroy v. Reebok Int'l. Ltd.,* 14 F.3d 1570, 1575 (Fed.Cir.1994), *reh'g denied and en banc suggestion declined* (1995)), *reh'g denied and en banc suggestion declined* (1997); *Lockwood v. Am. Airlines, Inc.,* 107 F.3d 1565, 1569 (Fed.Cir.1997). If the moving party makes such a showing, the burden shifts to the nonmoving party to demonstrate that a genuine dispute regarding a material fact exists by presenting evidence which establishes the existence of an element essential to its case upon which it bears the burden of proof. *See Celotex Corp. v. Catrett,* 477 U.S. at 322, 106 S.Ct. 2548; *Am. Airlines v. United States,* 204 F.3d 1103, 1108 (Fed. Cir.2000); *see also Schoell v. Regal Marine Indus., Inc.,* 247 F.3d 1202, 1207 (Fed.Cir. 2001).

Pursuant to RCFC 56, a motion for summary judgment may succeed whether or not accompanied by affidavits and/or other documentary evidence in addition to the pleadings already on file. *Celotex Corp. v. Catrett,* 477 U.S. at 324, 106 S.Ct. 2548. Generally, however, in order to prevail by demonstrating that a genuine issue for trial exists, the nonmoving party must go beyond the pleadings by use of evidence such as affidavits, depositions, answers to interrogatories and admissions. *Id.*

Even if both parties argue in favor of summary judgment and allege an absence of genuine issues of material fact, however, the court is not relieved of its responsibility to determine the appropriateness of summary disposition in a particular case. *Prineville Sawmill Co. v. United States,* 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1391 (Fed.Cir.1987)); *Chevron USA, Inc. v. Cayetano,* 224 F.3d 1030, 1037 n. 5 (9th Cir. 2000), *cert. denied,* 532 U.S. 942, 121 S.Ct. 1403, 149 L.Ed.2d 346 (2001). "[S]imply because both parties moved for summary judgment, it does not follow that summary judgment should be granted one or the other." *LewRon Television, Inc. v. D.H. Overmyer Leasing Co.,* 401 F.2d 689, 692 (4th Cir.1968), *cert. denied,* 393 U.S. 1083, 89 S.Ct. 866, 21 L.Ed.2d 776 (1969); *see also B.F. Goodrich*

*Co. v. U.S. Filter Corp.*, 245 F.3d 587, 593 (6th Cir.2001); *Massey v. Del Labs., Inc.*, 118 F.3d 1568, 1573 (Fed.Cir.1997). Cross-motions are no more than a claim by each party that it alone is entitled to summary judgment. The making of such inherently contradictory claims, however, does not establish that if one is rejected the other necessarily is justified. *B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d at 593; *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir.2000); *Allstate Ins. Co. v. Occidental Int'l., Inc.*, 140 F.3d 1, 2 (1st Cir.1998); *Reading & Bates Corp. v. United States*, 40 Fed.Cl. 737, 748 (1998). The court must evaluate each party's motion on its own merits, taking care to draw all reasonable inferences against the party whose motion is under consideration. *DeMarini Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314, 1322 (Fed.Cir. 2001); *Gart v. Logitech, Inc.*, 254 F.3d 1334, 1338–39 (Fed.Cir.2001), *cert. denied,* 534 U.S. 1114, 122 S.Ct. 921, 151 L.Ed.2d 886 (2002).

### Galva, Home, and Mutual Contract

The plaintiffs' cross-motion for partial summary judgment alleges that the defendant and Holland and Ross contracted for regulatory forbearances that:

> [A]llowed $8 million of the FSLIC cash assistance, $4.6 million of subordinated debt to be issued by the new institution [River Valley I], and $5 million of preferred stock to be purchased by FSLIC to be treated as regulatory capital. Further, FSLIC agreed to the Holland and Ross proposal allowing for goodwill created through the use of purchase method of accounting to be recognized and written off over a twenty-five year period.
>
> These regulatory capital forbearances constituted the essential elements of the economic consideration underlying the supervisory acquisitions in issue.

The plaintiffs allege that, as a consequence of the defendant's enactment of FIRREA and implementing regulations, the defendant abrogated its regulatory capital promises and prohibited River Valley I from using capital credit and supervisory goodwill forbearances to meet the regulatory capital requirements of River Valley I after the acquisition of

Galva, Home, and Mutual, which denied the business opportunities the defendant had pledged to Holland and Ross.

■ The defendant's cross-motion for partial summary judgment does not deny that the FHLBB and FSLIC granted forbearance agreements that allowed $8 million of the FSLIC cash assistance and $4.6 million of subordinated debt to be issued by River Valley I to be treated as regulatory capital, or that FSLIC agreed to the application of purchase method of accounting for goodwill which would be recognized and written off over a twenty-five year period. The defendant, however, does claim that the government is entitled to partial summary judgment "with respect to plaintiffs' claim that preferred stock issued to FSLIC could be included as regulatory capital pursuant to plaintiffs [sic] contract with the Government relating to the Galva/Home/Mutual acquisition." The defendant argues that the inclusion of the $5 million in preferred stock in River Valley I's regulatory capital was determined by 12 C.F.R. § 561.13(d) (1988), and not by any contract with the defendant. Therefore, according to the defendant, any subsequent change to 12 C.F.R. § 561.13(d) by FIRREA does not provide a basis for a contract claim by the defendant.

Section 561.13(d) of Part 12 of the C.F.R. provides in relevant part:

> The term "regulatory capital" also includes:
>
> (1) Preferred stock that is redeemable at the option of the issuer (i) which was issued prior to July 23, 1985, or (ii) which was issued after July 23, 1985: *Provided,* That the form of the security was approved prior to issuance pursuant to § 563.1 of this subchapter and states that no redemption may be made by the issuing insured institution if, after giving effect to such redemption, the insured institution would fail to meet its regulatory capital requirement under § 563.13 of this subchapter.

12 C.F.R. § 561.13(d).[2]

The July 29, 1988 FHLBB Resolution No. 88–638 and the Assistance Agreement exe-

---

**2.** On November 8, 1989, the Office of Thrift

Supervision issued new regulations which pre-

cuted by the FSLIC and Holland and Ross on July 29, 1988, approved the inclusion of $8 million of the FSLIC contribution and the inclusion of the $4.6 million subordinated debenture in the regulatory capital of River Valley I. The July 28, 1988 regulatory forbearance letter issued by the FHLBB also authorized River Valley I to amortize any intangible asset created by the application of push-down accounting for the purchase of Galva, Home, and Mutual to be amortized over a twenty-five year period. The July 29, 1988 FHLBB Resolution No. 88–638 also authorized the FSLIC to purchase $5 million of preferred stock of River Valley I.

The July 29, 1988 Assistance Agreement detailed the contributions made by the FSLIC in the acquisition of Galva, Home, and Mutual, and as part of the contributions made, the FSLIC purchased the $5 million of River Valley I preferred stock. The defendant contends that because 12 C.F.R. § 561.13(d) controls the application of preferred stock to regulatory capital, there can be no contract claim based on the disallowance of the preferred stock as regulatory capital. The defendant's argument that there was not a contractual understanding between the parties for the treatment of the $5 million of preferred stock in the acquisition documents is not persuasive.

The terms of 12 C.F.R. § 561.13(d) at the time of the transaction explicitly stated that preferred stock would be treated as regulatory capital. *See* 12 C.F.R. § 561.13(d). Also the explicit terms of the regulation that prohibits the redemption of the stock if it would cause the thrift to fall to meet the minimum capital requirements are key to understanding this case. *See id.* at § 561.13(d)(1)(ii). The significance of 12 C.F.R. § 561.13(d)(1)(ii) is the parties' understanding, evidenced through the transaction documents, that to effectuate the purpose of the acquisition of Galva, Home, and Mutual by River Valley I, the regulatory capital requirements of River Valley I had to be met subsequent to the transaction.

The plaintiffs' business plan submitted to the FHLBB on March 23, 1988, indicated that the inclusion of the $5 million in preferred stock issued to the FSLIC had to be included in River Valley I's regulatory capital requirements subsequent to the acquisition of Galva, Home, and Mutual for the resulting institution to meet its regulatory capital requirements. The March 23, 1988 business plan included the $5 million in preferred stock in the calculation of regulatory capital from March 31, 1988 through March 31, 1993, to show that the resulting institution, after the acquisition of Galva, Home, and Mutual, would meet minimum regulatory capital requirements.

On July 12, 1988, Leo B. Blaber, Jr., Principal Supervisory Agent of the FHLBB of Chicago, Illinois issued a memorandum to John Buckley, Jr., Secretary to the FHLBB, and discussed the financial viability of the Holland and Ross business plan for the acquisition of Galva, Home, and Mutual. The July 12, 1988 memorandum stated the following:

> In order to recapitalize the Institution, Messrs. Ross and Holland (the acquirers) have requested an accounting forbearance which would allow $8 million of the $33 million of FSLIC assistance to be credited to regulatory capital. In addition, $5 million in preferred stock will be issued to the FSLIC and a $4.6 million subordinated debt security will be issued, which will be purchased by the American National Bank and Trust Company of Chicago. The total regulatory capital of the institution at the time of merger will total $17.6 million or 8.38% of assets.

The plaintiffs and the FSLIC also executed a regulatory capital maintenance and dividend limitation agreement (RCMA) on July 29, 1988. The July 29, 1988 RCMA addressed the plaintiffs' obligation to maintain the required regulatory capital requirements in accordance with the applicable regulations. The July 29, 1988 RCMA also specified the grounds for the termination of the RCMA. Grounds for the termination of the July 29,

vented the use of the type of preferred stock issued by River Valley I to the FSLIC to be included in the core capital requirements of Riv-

er Valley I. *See* 54 Fed.Reg. 46,845, 46,859–60 (Nov. 8, 1989); *see also* 12 C.F.R. pt. 225, App. A (2003).

1988 RCMA could include one of the following: 1) five years from the date of the agreement; 2) if the $5 million of preferred stock was redeemed or transferred to the plaintiffs or River Valley I; or 3) if $5 million of additional capital is infused into River Valley I. The plaintiffs' contract claim that the $5 million in preferred stock was to be included in regulatory capital, as proposed by the plaintiffs' business plan, is supported by the terms of the RCMA. The termination of the RCMA at the end of five years is the same time period called for by the plaintiffs' business plan for the inclusion of the preferred stock in regulatory capital. The RCMA also could be terminated by the plaintiffs if they acquired $5 million to redeem the preferred stock or infuse the capital into River Valley I. The redemption of the stock or the infusion of $5 million in capital presumably was required to replace the preferred stock as regulatory capital. Therefore, the RCMA protected the FSLIC's investment of $5 million by the plaintiffs' guarantee that they would maintain the regulatory capital of River Valley I during the five years the preferred stock was treated as regulatory capital.

The documents referenced above evidence to the court that it was the parties' understanding that the $5 million of preferred stock purchased by the FSLIC was to be included in the computation of regulatory capital of River Valley I subsequent to the acquisition of Galva, Home, and Mutual. The defendant's argument that any subsequent change to 12 C.F.R. § 561.13(d) by FIRREA does not provide a basis for a contract claim by the plaintiffs appears to be directly at odds with the intent and understanding of the parties at the time of their contractual undertakings. If the defendant is correct, the plaintiffs would have been willing to risk a subsequent change in 12 C.F.R. § 561.13(d), and would have projected as part of their risk that they would have to come up with an additional $5 million to return River Valley I to regulatory capital compliance if the regulation changed in order to meet regulatory capital requirements, an assumption that is directly at odds with the July 29, 1988 RCMA. Justice Scalia, in *Winstar*, addressed such a proposition as follows:

They [plaintiffs] say that the very *subject matter* of these agreements, an essential part of the *quid pro quo*, was Government regulation; unless the Government is bound *as to that regulation*, an aspect of the transactions that reasonably must be viewed as a *sine qua non* of their assent becomes illusory. I think they are correct. If, as the dissent believes, the Government committed only "to provide [certain] treatment unless and until there is subsequent action," . . ., then the Government in effect said "we promise to regulate in this fashion for as long as we choose to regulate in this fashion"—which is an absolutely classic description of an illusory promise. *See* 1 R. Lord, Williston on Contracts § 1:2, p. 11 (4th ed.1990). In these circumstances, it is unmistakably clear that the promise to accord favorable regulatory treatment must be understood as (unsurprisingly) a *promise* to accord favorable regulatory treatment. I do not accept that unmistakability demands that there be a *further* promise not to go back on the promise to accord favorable regulatory treatment.

*United States v. Winstar*, 518 U.S. at 921, 116 S.Ct. 2432, (alterations and emphasis in original).

The parties' understanding of the treatment of the $5 million of preferred stock as regulatory capital is evidenced by the parties' understanding of the contract as shown by the documents in the record before the court. If the $5 million of preferred stock was not an agreed portion of River Valley I's regulatory capital resulting from the Galva, Home and Mutual transaction, River Valley I would not have been in compliance with regulatory capital requirements subsequent to the transaction. *See First Fed. Lincoln Bank v. United States*, 54 Fed.Cl. 446, 456–57 (2002) (finding that a promise for certain regulatory treatment need not by explicit when the contractual obligation is "subsumed" in other provisions of the contract documents); *Admiral Fin. Corp. v. United States*, 54 Fed.Cl. 247, 257 (2002) (noting the "madness argument" proposed by the defendant would have caused the thrift to fall out of regulatory compliance from the moment of the acquisition.) (citing *United States v. Winstar*, 518 U.S. at 910, 116 S.Ct. 2432).

The court finds that the parties contracted for the use of the $5 million of preferred stock as regulatory capital in the Galva. Home, and Mutual transaction. Additionally, because the defendant does not deny that the FHLBB and FSLIC granted forbearance agreements that allowed $8 million of the FSLIC cash assistance and $4.6 million of subordinated debt to be issued by River Valley I to be treated as regulatory capital, or that FSLIC agreed to the application of purchase method of accounting for goodwill which would be recognized and written off over a twenty-five year period, the court finds a contract that was formed in the Galva, Home, and Mutual transaction and was subsequently breached by the defendant when it enacted FIRREA and issued the subsequent regulations. As in the Glendale transaction discussed in the initial *Winstar* case, "[t]here can be little question that the application of FIRREA and the regulations thereunder to deny or restrict plaintiffs' contractual rights to use supervisory goodwill with the associated amortization periods ... was a breach ...." *Winstar v. United States,* 64 F.3d at 1544. When the plaintiffs satisfied the conditions set forth by the contractual documents, "the government's contractual obligations became effective and required it to recognize and accept the purchase method of accounting for the mergers and the use of supervisory goodwill and capital credits as capital assets for regulatory capital requirements." *Id.* at 1545. Accordingly, the court finds that the defendant breached the contractual rights of the plaintiffs with respect to the Galva, Home, and Mutual transaction after the enactment of FIRREA and issuance of the implementing regulations, which prohibited the plaintiffs from recording FSLIC cash contributions, preferred stock, and subordinated debt as assets for regulatory capital purposes, and from amortizing the goodwill.

**Republic Contract**

The plaintiffs assert that the court should enter judgment against the defendant as a matter of law as a result of the defendant's breach of its contractual commitments to grant forbearances regarding capital credits, subordinated debt, and goodwill arising out of the Republic transaction. The plaintiffs assert that the defendant "gave Holland and Ross these promises as consideration to induce them to guarantee personally $2 million in borrowings by River Valley [II] Rock Falls, which improved the capital structure of the thrift and protected the government's deposit insurance fund."

The documents contained in the record before the court detail the contractual terms of the parties' agreement for the acquisition of Republic by Holland and Ross. The FHLBB Resolution No. 88–612, dated July 27, 1988, authorized the supervisory conversion from mutual to stock form and the simultaneous merger of Republic with River Valley II. The FHLBB July 27, 1988 Resolution No. 88–612 provided that the $5 million of the initial cash contribution made by FSLIC to River Valley II under the July 29, 1988 Assistance Agreement would be credited to the regulatory capital account of River Valley II, and "shall constitute regulatory capital as defined in § 561.13 of the Insurance Regulation, 12 C.F.R. § 561.13 (1988)." The FHLBB July 27, 1988 Resolution No. 88–612 also provided that River Valley II was obligated to deliver to the FSLIC "documentation satisfactory to the FSLIC showing that the issuance and sale of $2,000,000 in subordinated debt to American National Bank has been successfully completed in accordance with 12 C.F.R. § 563.8–1." Finally, the FHLBB July 27, 1988 Resolution No. 88–612 required River Valley II to submit an accountant's analysis confirming the calculation of goodwill. The FHLBB July 27, 1988 Resolution No. 88–612 required that the accountant's analysis:

(a) specifically describe as of the Effective Date any intangible assets, including goodwill, and the discount and premiums arising from the Merger to be recorded on the Books of River Valley [II] for purposes of separate and consolidated financial statements; and (b) substantiate the reasonableness and conformity with regulatory requirements of the amounts attributable to intangible assets, including goodwill, and the discount and premiums and the related amortization periods and methods.

The July 29, 1988 Assistance Agreement for the supervisory conversion and merger of Republic with and into River Valley II, provided for a FSLIC cash contribution in the amount of $16.6 million, and further provided that $5 million of the FSLIC cash contribution would be credited to River Valley II's regulatory capital requirements. The July 29, 1988 Assistance Agreement also stated that generally accepted accounting principles would be used for calculations made under the Assistance Agreement, "except that where such principles conflict with the terms of the [Assistance] Agreement, applicable regulations, or any resolution or action of the Bank Board approving or relating to the Transaction or to this Agreement, then this Agreement, such regulations, or such resolution or action shall govern."

The July 29, 1988 forbearance letter issued by Mr. Blaber, Principle Supervisory Agent of the FHLBB of Chicago, to Mr. Holland, Vice Chairman of River Valley II, granted approval for the issuance and inclusion in River Valley II's regulatory capital requirements "a subordinated debenture in the aggregate principle amount not to exceed $2,000,000 as calculated in accordance with 12. C.F.R. § 561.13," subject to certain conditions. The May 18, 1989 FHLBB forbearance letter by John F. Ghizzoni, Assistant Secretary, to Mr. Holland, authorized River Valley II to credit, as a direct addition to regulatory capital requirements, up to $5 million of the FSLIC cash contribution. The May 18, 1989 FHLBB forbearance letter also provided that, for purposes of reporting to the FHLBB, "the value of any intangible asset, resulting from the application of push-down accounting in accounting for the purchase [of Republic], may be amortized by River Valley [II] over a period not to exceed 25 years by the straight line method."

The documents noted above memorialize the contract between Holland and Ross and the defendant. In exchange for the plaintiffs acquisition of Republic and their personal guarantee of the $2 million subordinated debenture, the defendant promised to allow River Valley II to include $5 million of the FSLIC contribution as regulatory capital, the inclusion of the $2 million subordinated

debenture as regulatory capital, and the twenty-five year amortization by the straight line method of the value of any intangible asset resulting from the application of push-down accounting in accounting for the purchase of Republic. The court finds, therefore, that the contract that was formed in the Republic transaction subsequently was breached by the defendant when it enacted FIRREA and issued the subsequent regulations. As noted above, "[t]here can be little question that the application of the FIRREA and the regulations thereunder to deny or restrict plaintiffs' contractual rights to use supervisory goodwill with the associated amortization periods ... was a breach ...." *Winstar v. United States*, 64 F.3d at 1544. Accordingly, the court finds that the defendant breached the contractual rights of the plaintiffs with regards to the Republic transaction after the enactment of FIRREA and the issuance of the implementing regulations, which prohibited the plaintiffs from recording FSLIC cash contributions and subordinated debt as assets for regulatory capital purposes, and from amortizing the goodwill.

**Peoria Savings Contract**

■ The plaintiffs' cross-motion for partial summary judgment alleges that the Holland and Ross proposal for the acquisition of Peoria Savings by River Valley I "called for two primary commitments from the government: (i) FSLIC would contribute $16.5 million, ..., and (ii) the government would grant RVFSB [River Valley I] 'the standard forbearances as provided in the RFP,' ... Included in these standard forbearances was the right to amortize the goodwill resulting from the merger over 25 years." The plaintiffs' cross-motion for partial summary judgment appears limited to the claim that the defendant breached its alleged contractual commitment regarding the amortization of the goodwill, created by the Peoria Savings acquisition, over a period of twenty-five years. The plaintiffs state:

Finally, in the Peoria acquisition, the government restated the promise it had made in the Home and Republic acquisitions, and in the *Winstar* cases, permitting the application of push-down accounting, and agreeing that the thrift could treat super-

visory goodwill as regulatory capital for 25 years. The government's promise in the Peoria transaction was consideration to Holland and Ross and induced them to invest an additional $5 million cash in RVFSB [River Valley I], which again protected the federal deposit insurance fund.

The defendant's cross-motion for partial summary judgment states that it is entitled to judgment as a matter of law on the plaintiffs' claim that the goodwill created pursuant to the Peoria Savings transaction could be amortized over twenty-five years. The defendant argues that:

> [N]either the Peoria assistance agreement, nor any of the documents incorporated into the agreement pursuant to the integration clause, indicate that the goodwill resulting from the transaction could be amortized over twenty-five years. In their opposition, plaintiffs do not proffer any evidence sufficient to defeat the Government's motion for summary judgment.

The United States Court of Appeals for the Federal Circuit in its *Winstar* decision held that based on the contemporaneous documents, the FHLBB and the FSLIC were contractually obligated to recognize the supervisory goodwill and the amortization periods reflected in the approved accountants' letter, required to be submitted by the plaintiffs in accordance with the FHLBB resolution approving the Glendale acquisition. *Winstar v. United States*, 64 F.3d at 1541–42. The Federal Circuit also relied on the surrounding circumstances of the Glendale transaction to further support the court's conclusion. The Circuit Court found that based on the extensive negotiations regarding the treatment of goodwill, that the merged institutions would not have been in regulatory compliance without amortization and inclusion of the goodwill in regulatory capital, and that "no healthy thrift would consummate a transaction that immediately put it in regulatory noncompliance," which evidenced the contractual obligation of the defendant to permit the long-term amortization of goodwill and its inclusion in regulatory capital. *Id.* at 1542.

In *California Federal Bank*, the Court of Appeals for the Federal Circuit reaffirmed

its holding in the *Winstar* case before the same court and held:

> As shown by the documentary evidence for the Brentwood and Family transactions, this long-term amortization of goodwill was a central consideration in Cal Fed's acquisitions. The documentary evidence for both the Brentwood and Family transactions demonstrates that purchase accounting and amortization of goodwill were essential terms of the negotiated transactions. There is no factual dispute concerning these documents, and they are precisely the type of evidence relied upon by the *Winstar* courts to establish the existence of contracts between acquiring thrifts and the government. Therefore, the government's breach of that contractual promise was substantial and material.

*Cal. Fed. Bank v. United States*, 245 F.3d at 1348.

The parties' disagreement centers on the amortization period of the goodwill created by the acquisition of Peoria Savings by River Valley I. The parties appear not to dispute whether the goodwill created by the acquisition of Peoria Savings would be included in regulatory capital of River Valley I. Indeed, the determination that "although transaction documents may not contain explicit promises by the government to count goodwill toward capital requirements, the promise may be 'subsumed' in the initial promise to permit the utilization of purchase method accounting and amortization of goodwill." *First Fed. Lincoln Bank v. United States*, 54 Fed.Cl. at 456–57 (citing *S. Cal. Fed. Sav. & Loan Ass'n v. United States*, 52 Fed.Cl. at 545; *United States v. Winstar*, 518 U.S. at 862, 116 S.Ct. 2432); *see also Sterling Savings v. United States*, 53 Fed.Cl. at 609–10; *Franklin Fed. Sav. Bank v. United States*, 53 Fed.Cl. at 710.

The documents of the Peoria Savings transaction clearly indicate that the parties understood that River Valley I would amortize the goodwill created by the acquisition. The acquisition proposal submitted by the plaintiffs for Peoria Savings, dated November 14, 1988, under the heading, "Accounting Issues," specifically addressed the amortization of the goodwill created by the acquisi-

tion. The November 14, 1988 proposal specified that:

> Not later than 90 days following the effective date of the acquisition, River Valley I shall submit to the FHLBB's Supervisory Agent an opinion of independent certified public accounts that the Acquiror has accounted for the transaction in accordance with generally accepted accounting principles ("GAAP") except that as herein provided by the FHLBB for purposes of reporting to the FHLBB: the value of any resulting intangible assets may be amortized by the Acquiror over a period of 25 years by the straight line method.

Subsequently, on December 9, 1988, the plaintiffs submitted a proposed business plan for the acquisition of Peoria Savings which specified that for the successful performance of the operation of River Valley I following the acquisition of Peoria Savings, "[g]oodwill is amortized on a straight line basis over 25 years."

The December 29, 1988 FHLBB Resolution No. 88–1490, approving the conversion of Peoria Savings from the mutual to the stock form of organization and the merger of the converted thrift into River Valley I, did not specifically address the amortization period of the goodwill created by the Peoria Savings transaction. The December 29, 1988 FHLBB Resolution No. 88–1490, however, did specify that within ninety days following the effective date of the merger, River Valley I was required to submit an accountant's analysis addressing the following: 1) "describe as of the Effective Date [of the merger] any intangible assets, including goodwill, and the discount and premiums arising from the Merger to be recorded on the Resulting Association's books," and 2) "substantiate the reasonableness and conformity with regulatory requirements of the amounts attributed to intangible assets, including goodwill, and the discount and premiums and related amortization periods and methods . . . ."

The December 31, 1988 Assistance Agreement entered into between FSLIC and River Valley I, regarding the merger of Peoria Savings into River Valley I, also addressed the accounting treatment of the transaction and provided that generally accepted accounting principles would be used for calculations made under the Assistance Agreement, "except that if such principles conflict with the terms of the [Assistance] Agreement, applicable regulations, or any resolution or action of the Bank Board approving or relating to the Transaction or to this Agreement, then this Agreement, such regulations, or such resolution or action shall govern."

As provided in the December 29, 1988 FHLBB Resolution No. 88–1490, goodwill realized from River Valley I's acquisition of Peoria Savings would be amortized, yet the actual term of the amortization period was not addressed. The independent audit report of River Valley I, dated April 14, 1989, was submitted in compliance with the requirements of the December 29, 1988 FHLBB Resolution No. 88–1490 and was required to address the amortization period. The audit report indicates that the Peoria Savings acquisition by River Valley I was "accounted for under the purchase method of accounting." The audit report further states that, "[t]he balance of net effect of purchase accounting adjustments includes approximately $3,552,000 relating to that acquisition and for which no amortization was recorded in 1988 in these consolidated financial statements." The audit report does not indicate the length of the amortization period attributable to the goodwill created by the Peoria Savings transaction.

Other documents in the record also address the goodwill created by the Peoria Savings transaction, but do not indicate the term of the amortization period. In fact, internal governmental documents that considered and recommended approval of the plaintiffs' acquisition of Peoria Savings reflect a disagreement over the term of the amortization period.

First, a November 22, 1988 FHLBB interoffice memorandum questioned the term of the amortization period identified in the plaintiffs' acquisition proposal. The November 22, 1988 FHLBB interoffice memorandum provided the following:

> Phil Mento told me that MAD/FSLIC was inclined to agree with our recommendation to proceed with Homer Holland's proposal;

however, Vicki Hawkins (memo attached) and Richard Wissinger were concerned that certain provisions of Holland's proposal caused the proposal to be non-conforming. Specifically, the amortization of goodwill for 25 years and the granting of forbearances on scheduled items.

On December 15, 1988, Stuart D. Root, Executive Director for FSLIC, issued a memorandum to the FHLBB providing his recommendation for the approval of the merger of Peoria Savings Into River Valley I. The December 15, 1988 FSLIC memorandum did not address the accounting or amortization period of the goodwill created by River Valley I's acquisition of Peoria Savings. Mr. Blaber, Principal Supervisory Agent of the FHLBB of Chicago, however, issued a memorandum on December 16, 1988 which appears to recommend a twenty-five amortization period for the goodwill. The December 16, 1988 memorandum stated that:

> The submissions by the applicant indicate that the proposed merger/conversion will be accounted for under the purchase method of accounting .... The assets and liabilities of the merging institution will be marked to market which will either eliminate the non performing assets or book them at their most recent market value. The goodwill so created will be amortized over a period of 25 years.

Another internal governmental memorandum, issued on December 20, 1988, by Michelle LeClair, Acting Regional Director of the FSLIC Analysis and Evaluation Division, noted the amortization period of the goodwill proposed by the plaintiffs' acquisition proposal, and stated that the proposal provided that "[g]oodwill is amortized over a period of 25 years." Subsequent to the December 20, 1988 memorandum by Ms. LeClair, however, Helen K. Mirza, a supervisory agent with the FHLBB issued a memorandum on December 23, 1988, and addressed the amortization period of the Holland and Ross acquisition proposal as follows: "In addition, the Office of Regulatory Affairs also advised that projected goodwill should be amortized over a ten year period as opposed to the 25 year period provided in the financial projections. ORA is concerned that the additional expenses re-

sulting from those adjustments will affect the resulting institutions 'future prospects and viability.'" Therefore, six days prior to the FHLBB issuance of the December 29, 1988 FHLBB Resolution No. 88–1490, the defendant still questioned the amortization period proposed by the plaintiffs.

The term of the amortization period of the goodwill flowing from the acquisition of River Valley I should have been resolved by the plaintiffs submission of the independent audit report as required by the December 29, 1988 FHLBB Resolution No. 88–1490, which required the audit report to "substantiate the reasonableness and conformity with regulatory requirements of the amounts attributed to intangible assets, including goodwill, and the discount and premiums and related amortization periods and methods ...." As found above, however, the independent audit report of River Valley I, dated April 14, 1989, did not address the term of the amortization period for the goodwill.

The plaintiffs' cross-motion for partial summary judgment offers the deposition testimony of two government regulators as support for their argument that the amortization period for the goodwill created by the Peoria Savings acquisition should be amortized over a period of twenty-five years. According to the plaintiffs, Larry Farris as "the principle regulator of the Holland and Ross thrifts," and Leo B. Blaber, as "FHLB of Chicago President," both provided deposition testimony that support the plaintiffs' argument for the amortization period of twenty-five years for the goodwill created by the Peoria Savings transaction.

The defendant argues in rebuttal that the deposition testimony of Mr. Farris offered by the plaintiffs does not address the term of the amortization period of the goodwill. The defendant also asserts that the testimony of Mr. Blaber does not support the existence of a contract for the amortization of the goodwill because Mr. Blaber was not questioned regarding the December 23, 1988 memorandum issued by Helen K. Mirza, which suggested that the amortization period should be ten years rather than twenty-five years, and that Mr. Blaber indicated that he had no independent recollection of the Peoria Sav-

ings transaction, or for that matter, the other transactions at issue in this case.

Based on the record before the court, the documents evidence the existence of a contract for the amortization of the goodwill created by the acquisition of Peoria Savings by the plaintiffs. The court finds, however, that there are issues of material fact regarding the amortization period of the goodwill. The record contains the December 29, 1988 FHLBB Resolution No. 88–1490 which permitted the amortization of goodwill and conditioned the term of the amortization period on the submission of an independent accountant's analysis substantiating the reasonableness of the amortization period. The independent audit report of River Valley I, dated April 14, 1989, detailed the goodwill created by the Peoria Savings acquisition, but did not provide an amortization period. The defendant has raised material issues of fact in response to the deposition testimony offered by the plaintiffs which sought to establish the twenty-five year amortization period. When resolving a motion for summary judgment, the court neither may make credibility determinations nor weigh the evidence and seek to determine the truth of the matter. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255, 106 S.Ct. 2505. The court must limit its inquiry to whether the undisputed facts in the joint stipulations of fact and documentary record establish the terms of the contract as a matter of law. The disputed and undeveloped facts before the court do not allow the court to determine the amortization period of the goodwill contract arising from the Peoria Savings transaction.

## CONCLUSION

Pursuant to the discussion above, the court finds that the plaintiffs were parties to the contracts for the acquisition of Republic and Peoria Savings and **DENIES** the defendant's motion to dismiss. The court also finds that pursuant to the contract for the acquisition of Galva, Home, and Mutual, the plaintiffs were permitted to include the $5 million in preferred stock purchased by the FSLIC in regulatory capital. The defendant's cross-motion for partial summary judgment regarding the treatment of the use of the $5

million in FSLIC preferred stock is **DE-NIED**. The plaintiffs' cross-motion for partial summary judgment on the defendant's breach of contract for the acquisition of Galva, Home, and Mutual, which permitted the use of the $5 million of preferred stock, $8 million of the FSLIC cash assistance, and $4.6 million of subordinated debt to be treated as regulatory capital, and the application of purchase method of accounting for goodwill, which would be recognized and written off over a twenty-five year period, is **GRANTED**. The plaintiffs' cross-motion for partial summary judgment on the defendant's breach of contract in the Republic acquisition for the inclusion of $5 million of the FSLIC contribution as regulatory capital, the inclusion of the $2 million subordinated debenture as regulatory capital, and the twenty-five year amortization by the straight line method of the value of any intangible asset resulting from the application of push-down accounting in accounting for the purchase of Republic, is **GRANTED**.

Although the court finds the parties contracted for the amortization of goodwill created by the Peoria Savings transaction, the court finds material facts in dispute regarding the amortization period for the goodwill. A trial or agreement of the parties is necessary to establish the facts from all the parties' communications, as well as the particular economic circumstances surrounding the transaction to determine the amortization period of the goodwill created by the Peoria Savings transaction. The plaintiffs' cross-motion for partial summary judgment regarding liability on the amortization of goodwill is **GRANTED IN PART** and **DENIED IN PART**. There remain material issues of fact in dispute on the issue of the length of the amortization period. The defendant's cross-motion for summary judgment on the Peoria Savings transaction is **DENIED**.

**IT IS SO ORDERED.**